Argued September 14, 1943; affirmed January 18, 1944

ARNEIL *v.* SCHNITZER ET AL.

(144 P. (2d) 707)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, and LUSK, Associate Justices.

*A. C. Spencer, Jr.,* of Portland (Maguire, Shields, Morrison & Biggs, of Portland, on the brief) for appellants.

*Paul R. Harris,* of Portland (Glenn Y. Wells and C. J. Stocklen, both of Portland, on the brief) for respondent.

ROSSMAN, J.    This is an appeal by the defendants from a judgment in favor of the plaintiff, based upon a verdict. The judgment was entered in an action in which the plaintiff charged that the defendants so negligently maintained their premises that a fire started thereon and, escaping therefrom, destroyed property belonging to the plaintiff and other properties belonging to twenty-four individuals who assigned their claims to him. The total sum awarded by the challenged judgment is $8,166.48.

The assignments of error are six in number. The first is based upon an order which denied a motion made by the defendants for an involuntary nonsuit. The second challenges a ruling which refused to admit

as evidence a written declaration purportedly made by one Ellis Miller, since deceased, that he negligently ignited the fire. The third attacks a ruling which denied an offer of proof made by the defendants; it, like the second, arose out of Miller's purported declaration. The fourth is based upon a ruling which denied the defendants' motion for a directed verdict. The fifth challenges instructions which were given to the jury, and the sixth is based upon the trial judge's refusal to embrace some instructions submitted by the defendants.

The defendants are partners engaged in the salvage business under the name of Alaska Junk Company. In May of 1939 they purchased an idle sawmill plant located at West Timber in Washington county. The mill stood upon a site of 108 acres which was a part of the purchase. The plant consisted of a sawmill, lumber sheds, office, hotel, pool hall and a number of small houses which were occupied by the mill's employees when it operated. Much of the 108 acres was covered with second growth fir which extended down to the sawmill itself. The areas beyond the mill site were covered with timber.

The sawmill and lumber sheds were built in a hollow which was covered with timber prior to their erection. When the timber was cut, the stumps, some of the logs and the debris were left upon the premises. In order to bring the site up to the level of the land, a platform, dock or pier, was built in the hollow upon piling four to twenty feet in height. The platform or dock was rectangular in shape and several hundred feet long. Near by on one side was a road which at that point formed a bend. A part of the rectangle abutted upon the road. About four hundred feet from the mill were the office building, pool hall and hotel. In the area

between these structures and the mill was a railroad spur.

The defendants purchased this property, not for the purpose of operating the mill, but to reclaim from the property everything of value. Shortly after the purchase the defendants began to dismantle the machinery and then the larger buildings. By the time of the fire the sawmill machinery and sprinkler system had been removed and the crew was engaged in salvaging the large timbers. In dismantling the buildings the outside sheeting, shingles, tar paper roofing and other material which was deemed of no value were thrown together in disorderly piles. One of the piles was about two hundred and fifty feet in length and twenty feet in depth. Similar debris was thrown under the dock at places where openings had been made in reclaiming large timbers. When the mill was in operation quantities of sawdust accumulated in deep piles under the dock. Much of it, according to the witnesses, was oil soaked. That condition was due to the fact that while the mill was in operation oil and grease dripped from the machinery upon the accumulating sawdust. One of the witnesses, referring to the sawdust, described it thus: "There were tons of sawdust, oil-soaked sawdust. * * * there were big piles of it."

The defendants had no watchman for this property. Before the fire occurred they had removed from the property, as already indicated, all of the fire fighting equipment; that is, hose, pipes, water pumps, water tower, sprinkler system, and so forth.

Ed Conklin, a field inspector for the State Forester, after testifying that this mill stood "right in a forest area," said that he made an inspection of the property on June 2. He found it to be "a fire hazard." He swore

that the piles of debris and the old docking were "very inflammable at that time of year." He deemed the property such a fire menace that he went to Portland and described the situation to the defendants. He advised them to employ a watchman for the property and to "supply a pump, that is, what we call a fire pump, * * * and five hundred feet of one and one-half inch hose." The defendants did not comply with his suggestions. Cecil Kyle, the district fire warden, referring to the condition of the property after the defendants had begun their operations, described it as "really a fire hazard; you would drive through a fire hazard on both sides of the road. The docking went right up to the road on the north side, and take the whole old mill site and the grounds around there, it was a very, very bad fire hazard. * * * there were shingles and debris laying along the road where a cigarette, if you would throw it out, would light a fire. * * * The word 'hazard', if I am not wrong, is something that is quite dangerous * * *." He swore that he offered "to help clean up the hazard," but the defendants did not accept the offer. According to him, the defendants provided no fire protection whatever for the property.

The homes of the plaintiff and his assignors were in the immediate vicinity of the mill. Some of them had been built for the mill's employees and stood upon the mill site among the firs. They were purchased from the defendants; the buyers bought only the houses; the defendants retained the land.

From the defendants' (appellants') brief, we quote:

"At the close of respondent's testimony, it was stipulated that fire patrol assessments had been made by the State Board of Forestry during the years of 1939 and 1940 against these properties owned by appellants and that such assessments had

not been paid by appellants; and further that appellants at the time of the fire did not belong to any fire patrol association as described in the Forest Protection Act.''

July 3, 1940, at about midnight, a fire broke out upon the mill site. The blaze quickly mounted to considerable size and, sweeping across the space where the railroad spur was located, entered the area where the plaintiff's and his assignors' homes were located. After destroying those structures it swept on through timber a couple of miles distant.

The plaintiff's (respondent's) brief says:

"The plaintiff offered no testimony as to what spark caused this inflammable material to burst into flame, and all the defendants offered was a so-called statement by Ellis Miller, since deceased, that he had been in the mill property, had laid down and gone to sleep smoking a cigarette. That he moved, subsequently awakened and saw fire where he had first laid down.''

Miller's ''so-called statement'' was as just indicated except that it further disclosed that an hour or so before the fire developed he went under the dock to sleep off a drunk. While endeavoring to fall asleep he smoked some cigarettes and threw the butts about him. Then he moved to another spot where he was shortly awakened by flames. The declaration was made to the district attorney while Miller was in custody of the police under an accusation of the crime of arson. After it was transcribed, Miller signed it, according to the defendants' witnesses. The persons who heard Miller make his declaration repeated it from the witness stand as witnesses for the defendants. When the signed statement was offered as an item of evidence, it was excluded by a ruling which said: ''The paper itself, as a paper,

is not admissible in evidence." At least one of the witnesses, in narrating Miller's declaration, used the written statement to refresh his recollection.

Forming a part of the verdict were interrogatories submitted to the jury. One of them asked the jury whether or not the defendants "maintained a public nuisance as set forth in sub-division VIII of the second amended complaint." The answer was "yes." The jury wrote "contributory" as its answer to the question as to whether or not the maintenance of the nuisance just indicated was "the proximate cause, or contributing proximate cause of plaintiff's loss." A third interrogatory inquired whether the defendants "maintained a public nuisance as set forth in sub-division VIII-A of the second amended complaint." The jury answered "yes." Next, the jury wrote "contributory" as its answer to a question which inquired whether the maintenance of the nuisance just indicated was "the proximate cause or contributing proximate cause of plaintiff's loss." A fifth inquiry asked the jury to answer whether "the defendants were guilty of common law negligence in one or more of the particulars as set forth in paragraph IX of plaintiff's second amended complaint." It answered "yes." The jury wrote "contributing" as its answer to the final interrogatory which inquired whether the negligence just indicated was "the proximate cause or contributing proximate cause of plaintiff's loss." Paragraph VIII of the second amended complaint charged:

"That said forest land was inadequately protected against the starting or spreading of fire thereon or therefrom; and was covered in part by inflammable debris likely to further spread a fire; * * *"

Paragraph VIII-A alleged:

"On or about the 2nd day of July, 1940, a fire originated upon said forest land owned by defendants as above described, and burned uncontrolled thereon, and/or without proper precaution being taken to prevent its spread and thereby constituted a public nuisance, * * *."

Paragraph IX alleged that the defendants were guilty of negligence in the following particulars:

"(a) * * * that litter and debris accumulated on, around and under said dock.

"(b) * * * defendants * * * permitted litter, debris and oil-soaked sawdust to remain on said premises and did not attempt to remove it or arrange it so as to reduce the danger of fire.

"(c) * * * although between June 1, 1940 and July 2, 1940, was a hazardous fire period, said defendants carelessly and negligently failed and neglected to furnish and/or provide a watchman and/or fire-fighting equipment.

"(d) * * * defendants carelessly and negligently failed and neglected to comply with the order of the State Fire Marshal.

"(e) * * * although at said time and place defendants were the owners of timber land * * * defendants * * * negligently failed and neglected to furnish or provide therefor * * * adequate protection against the starting or spread of fire thereon or therefrom which met with the approval of the State Board of Forestry."

We explain that the complaint makes no averment that the defendants ignited the combustible materials.

As we have indicated, the first assignment of error is based upon an order which overruled the defendants' (appellants') motion for an involuntary nonsuit. In presenting the motion, the defendants' counsel said: "The plaintiff has produced no evidence showing or

tending to show that the negligence of defendants, if any, was the proximate cause of the fire    *   *   *.'' Defendants' brief, in support of this assignment of error, states:

"Whatever theory the plaintiff would advance, and whether the right to recover be based upon common-law remedies, the alleged violations of the Forest Protection Act under Sec. 107-229, O. C. L. A., or by reason of the claimed non-compliance on the part of defendants with the order of the State Fire Marshal under Sec. 99-2714, O. C. L. A., a prerequisite to his recovery is the showing that the defendants were in some way connected with or responsible for the origin of the fire.''

We shall now consider the merits of this assignment of error.

Section 107-229, O. C. L. A., says:

"In addition to the penalties provided in this act, * * * private owners whose property is injured or destroyed by fires in violation of this act may recover in a civil action double the amount of damages suffered if the fires occurred through wilfulness, malice or negligence.''

Section 99-2714, O. C. L. A., also cited in the above excerpt which we took from defendants' brief, renders an owner who fails to comply with a written order of the State Fire Marshal liable to anyone damaged through the failure. However, since the plaintiff does not base his cause of action upon that section, we shall bestow no attention upon it.

Section 107-208, O. C. L. A., says:

"Any and all inadequately protected forest land covered wholly or in part by inflammable debris or otherwise likely to further the spread of fire, which by reason of its situation or condition or lack of

protection endangers life or property, is hereby declared to be a public nuisance, * * *."

According to Section 107-201:

"* * * 'forest land' means and includes any forest, woodland, brushland, cut-over land, slashing, chopping or clearing containing any inflammable forest debris; 'timber land' means any land having enough timber, standing or down, living or dead, either mature timber or young growth to constitute a fire menace to itself or adjoining lands; * * *" Section 107-211, O. C. L. A., says:

"Any one * * * who wilfully or negligently allows fire to escape from his own land, * * * shall be punished * * *."

Section 107-241, O. C. L. A., says:

"Every owner of timber land in the state of Oregon shall furnish or provide therefor, during the season of the year when there is danger of forest fires, adequate protection against the starting or spread of fire thereon or therefrom which shall meet with the approval of the state board of forestry."

Section 107-243, O. C. L. A., authorizes the State Forester to provide protection against fire for timber land, if the owner fails to do so, and directs the county court of the county where the land is situated to assess the cost of the protection against the land. We assume that the stipulation of the parties, previously quoted, refers to assessments of that kind. Thus, it once more appears that the defendants neglected to provide any sort of fire protection for their property.

From the preceding review of the evidence, it is seen that the defendants, through their purchase, acquired several unoccupied buildings which stood in the midst of a forest area. The vacant buildings, as well as the space under the dock, constituted a ready

invitation to itinerants, like Ellis Miller, to enter and idle away time. Vacant, dilapidated buildings are allurements to children in the daytime and at nightfall become lodgings for those who can afford nothing better. Those who own such buildings know that since they are without the protection of either tenant or owner, they may readily become fire hazards. The defendants, upon acquiring ownership of these unoccupied buildings, made the situation worse. First, they removed all of the fire-fighting equipment from the property. Then, in tearing down the buildings, they threw together in great piles discarded shingles, splintered boards, strips of tar paper and other combustible material until they had built several pyres of great size. While the tinder was being piled high, the closed season arrived and mid-June brought with it a succession of dry warm days. Then came July 3 and the spark which enabled the pyres to claim as their victim the neighboring forest.

In the face of these facts and the above sections of our laws, we are wholly unable to say that the jury was not warranted in answering "yes" to the questions which inquired whether or not the defendants failed to exercise due care, and whether or not they permitted the mill site to become a public nuisance. A reading of the enactments of recent legislative sessions shows that our lawmakers are becoming more and more conscious of the fact that the only way that Oregon's greatest natural resource can be protected from fire is to require owners of timber land, which contains inflammable material, to remove it or adopt appropriate safeguards to keep fire from reaching the material. A violation of both alternatives renders the land a public nuisance.

We are satisfied that the record contains substantial evidence indicating that the defendants' property was "a public nuisance" within the contemplation of § 107-208, O. C. L. A., above quoted. Clearly, the jury was warranted in finding that the defendants employed no precautions whatever to prevent the combustible material from igniting nor to prevent fire from escaping from their property to that of their neighbors.

■ But the defendants argue that before the plaintiff could be entitled to a verdict it was necessary for him to prove, not only that the defendants maintained their property in such a manner that it was a public nuisance, but also that they negligently, or intentionally, set the property afire. They cite: 22 Am. Jur., Fires, p. 601; *Roundtree v. Mount Hood R. R. Co.*, 86 Or. 147, 155, 168 P. 61; *Eastman v. Jennings-McRae Logging Co.*, 69 Or. 1, 14, 138 P. 216, Ann. Cas. 1916A, 185; *Richmond v. McNeill*, 31 Or. 342, 357, 49 P. 879; and Annotation, 42 A. L. R. 783, 784, 820. The defendants also contend that even if it be assumed that they were negligent, they cannot be liable to the plaintiff if Ellis Miller, "a trespassing third person," set the fire. They rely upon *Aune v. Oregon Trunk Ry. Co.*, 151 Or. 622, 628, 51 P. (2d) 663; *Miami Quarry Co. v. Seaborg Packing Co.*, 103 Or. 362, 371, 204 P. 492; *Richmond v. McNeill*, supra; *Leavitt v. Stamp*, 134 Or. 191, 293 P. 414; *Stone v. Boston & A. R. Co.*, 171 Mass. 536, 51 N. E. 1, 41 L. R. A. 794; *Moody v. Gulf Refining Co.*, 142 Tenn. 280, 218 S. W. 817, 8 A. L. R. 1243; and 38 Am. Jur., Negligence, p. 728, §§ 71 and 72.

We believe that both of the above contentions can be conveniently considered together and shall now do so.

It is true that the Richmond decision, at the page mentioned by the defendants (357), contains language which supports their contention, but a reading of that decision shows that the part upon which they rely was unnecessary to the decision of the case. The circuit court had entered a judgment of nonsuit against the plaintiff. In reversing that judgment there crept into the decision the words upon which the defendants rely; but they were unnecessary to the decision. Moreover, the entire milieu is different. The Richmond decision, unlike our present case, was not concerned with forest land, and since it was announced our legislature has endeavored to shield our timbered areas from the fire hazard by an ever increasing number of enactments that impose an ever increasing measure of care upon the owner. The part of the Roundtree decision which the defendants cite (p. 155) must be considered in connection with the fact that in that case, unlike the present one, the complaint averred that the defendants started the fire and detailed the manner. The language upon which the defendants rely was necessitated by that circumstance and was appropriate thereto. The Aune case was an appeal from a judgment dismissing the action after a demurrer had been sustained to the amended complaint and the plaintiff had declined to plead further. The demurrer was sustained on the ground that the amended complaint failed to state a cause of action. The decision commenced with a reiteration of the rule that under the circumstances the pleading which the plaintiff sought to sustain would have to be construed most strongly against him. The complaint alleged (1) that the defendant spotted some empty boxcars upon a spur which it owned and which lay alongside the plaintiff's ware-

house; (2) that it neither locked the cars nor placed them in custody of a watchman; (3) that some hobos wrongfully entered the cars; (4) that the hobos set the cars afire; and (5) that the resulting blaze destroyed the plaintiff's property. Our decision pointed out that the complaint nowhere charged the defendant with an act of negligence and, of course, held that, in the absence of such an averment, the demurrer was properly sustained. The decision, however, went on:

"Moreover, if the acts of the defendant were negligent as contended for, they were too remote and * * * ."

That is the part upon which the defendants rely. The decision did not deem the boxcars a fire menace, and certainly did not regard them as a public nuisance.

In the Stone case (Mass.), the plaintiff, like our present one, charged that the defendant maintained its premises in violation of a state statute and that they were a public nuisance. According to the decision, the plaintiff contended "that the defendant is responsible for the damage resulting from the public nuisance, whether the act of starting the fire was due to a third person or not." The lower court, at the close of the plaintiff's evidence, directed a verdict for the defendant. This was affirmed upon appeal in the opinion which we shall now review. The decision confined itself to an inquiry as to whether there existed between the defendant's negligently maintained premises and the destruction of the plaintiff's property the relationship of cause and effect. The defendant, a common carrier, maintained a freight station seventy-five feet from the plaintiff's property. The latter was consumed by a fire which originated in the station.

A part of the station consisted of a wooden platform where the defendant kept barrels of oil until the consignees called for them. The platform, through long-continued use, had become saturated with oil which had leaked from the barrels. The statute prohibited railroads from keeping oil upon their premises in towns for longer than forty-eight hours without special permit. September 13, when the fire broke out, oil had remained upon the platform for more than forty-eight hours. Just before the fire, one Casserly brought a load of freight to the station for shipment. He was not the defendant's employee. While awaiting attention Casserly lighted his pipe and threw the match under the platform. Promptly a fire blazed up which destroyed the station and then the plaintiff's property. The plaintiff contended that the defendant was guilty of negligence in the maintenance of the platform, and also that the defendant's violation of the forty-eight hour statute rendered the platform a nuisance. The lower court, at the close of the plaintiff's evidence, instructed a verdict for the defendant. In sustaining the resulting judgment, the court, upon appeal, assumed that the facts warranted a finding of negligence. It held that Casserly's act was an intervening one which the defendant was not bound to anticipate and for which it was not liable. The decision said:

> "There was no evidence * * * that the platform was an unsuitable place for its (the oil's) temporary storage till it could be removed, or that the defendant could have prevented the escape of oil upon the platform from leaky barrels. * * * One is bound to anticipate and provide against what usually happens and what is likely to happen; * * * There was nothing to show that such a consequence had ever happened before, during the eight years covered by the plaintiff's testimony, or that there

were any existing circumstances which made it probable that it would happen."

It freely conceded that "many instances" occur

"where it has been found that it was the duty of the original wrong-doer to anticipate and provide against such intervention, because such intervention was a thing likely to happen in the ordinary course of events. * * * The fact, if established, that the defendant's platform with the oil upon it constituted a public nuisance is immaterial, under the circumstances of the present case. * * * Illegality on the part of a defendant does not of itself create a liability for remote consequences. * * * The casual connection between the two still remains to be established."

A reading of the decision reveals that the court deemed the defendant's status as a common carrier an important factor. For instance, referring to freight brought to the station, the decision said:

"The defendant was bound by law to accept and carry them. It could not lawfully exclude Casserly from its grounds. By Pub. Sts. c. 112, § 188, it was bound to give all persons reasonable and equal terms, facilities and accommodations for the transportation of merchandise upon its railroad, and for the use of its depot and other buildings and grounds. Casserly came there in his own right, and the defendant is not responsible for him in the same way that perhaps it might be responsible for a servant, agent, or, according to some statements of the law, guest."

Justice Knowlton, in a dissenting opinion, expressed the belief that the plaintiff was entitled to have the cause submitted to the jury. Two important facts distinguish that case from the one before us. First, the court found that the platform was not unsuitable to the purposes for which it was used, and that the

defendant could not have prevented oil from leaking upon the platform; second, Casserly, in that case, unlike Ellis Miller in our case, had a right to be where he was. Casserly could not have been excluded, but Miller, as a guest, whether he was an invitee or not, could, and should, have been excluded.

In the Moody case (Tenn.) a tank car loaded with gasoline consigned to the defendant took fire and created a blaze which consumed the plaintiff's nearby property. The car was upon a railroad spur adjacent to the defendant's warehouse. Neither the spur nor the defendant's property abutted upon any public thoroughfare. According to the decision:

> "The defendant's premises had become more or less greasy or oily from gasoline, oils and other substances which had been permitted to escape or leak from the receptacles in which they were contained, * * * ."

But the court found that the fire was not caused by the condition of the premises. The fire was started while two employees of the defendant were preparing to run the gasoline from the car into the defendant's tanks. Immediately after one of the employees had started a small preliminary flow into a tub, in order to separate the impure gasoline from the rest, workmen of another concern warned him that they were about to set off a blast for the purpose of breaking some rocks. Thereupon he took refuge on the other side of the car and before he returned to his original place some gasoline had overflowed from the tub. At that juncture some boys, fourteen years of age, appeared and asked whether the substance was gasoline. They were told that it was. The employee at that moment went into the warehouse to obtain some buckets and

while he was absent the boys threw a lighted match into the gasoline and thus caused the fire. The decision describes the employees who were handling the gasoline as "competent and experienced." The court deemed the act of the boys an "independent intervening act", and said:

> "This act on the part of said boys was not such as could have been reasonably anticipated by defendant's employee. It is not shown that defendant's employee knew that the boys were smoking or that they had matches. The undisputed evidence is that the boys knew it was gasoline that was running into the tub, and knew its inflammable and dangerous qualities, and defendant's employee had no reason to anticipate that they would deliberately throw a lighted match into it during the short interval that he was absent on his errand."

It is clear that, since the gasoline was in the custody of employees who were "competent and experienced," the court felt that the defendant had done all that was required of it to prevent the car from becoming a source of danger to neighboring property. The circumstances which made it possible for the defendant's care to prove inadequate were the blast which drove the defendant's employee away from his post of duty, the simultaneous overflow of the gasoline, and the appearance of the boys. The court deemed the blast a sudden emergency, and held that therefore the employee's act in leaving his post of duty was not negligence.

At least four important facts distinguish that case from the one before us: (1) The carload of gasoline was not a nuisance, like the defendant's tinder-covered property; (2) the defendant's property, unlike that of these defendants, was not adjacent to a public thorough-

fare; (3) the tank car, unlike the defendants' piles of tinder, was in the custody of competent, experienced employees; and (4) something unusual in that case (the blast) threw the defendant's operations out of joint, whereas in the present case, events pursued their expected course.

The defendants' citation of 42 A. L. R. is to a collation of decisions. The part which deals with liability, based on condition of the premises, states:

"The owner of property which is negligently left in such a condition that it is easy for a fire to catch thereon and spread to neighboring premises, as, by reason of combustible materials left unguarded, may be liable for damage done by a fire started therein by him or his employees, though the fire starts by pure accident or by an act which would not be negligent but for the condition of the premises."

The defendants' reference to 38 Am. Jur., Negligence, page 728, §§ 71 and 72, was prompted by Miller's purported declaration that he threw lighted cigarette butts about him while he was under the dock, and by § 107-228, O. C. L. A., which says:

"It shall be unlawful, during the closed season, for any one to throw away any lighted tobacco, cigars, cigarettes, * * * on any forest land, * * *. Any one violating the provisions of this section shall be deemed guilty of a misdemeanor and * * *."

Section 71 of 38 Am. Jur., Negligence, says:

"The general rule is that when, between negligence and the occurrence of an injury, there intervenes a wilful, malicious and criminal act of a third person which causes the injury but was not intended by the negligent person and could not have been

foreseen by him, the causal chain between the negligence and the accident is broken * * * . The intervention of a criminal act, however, does not necessarily interrupt the relation of cause and effect between negligence and an injury. If at the time of the negligence, the criminal act might reasonably have been foreseen, the causal chain is not broken by the intervention of such act. Moreover, the surrounding circumstances, including the nature of the community or locality in which the negligence occurred, may be sufficient to render an intervening criminal act reasonably foreseeable within the meaning of such rule * * * ."

Section 72 of the same treatise says:

"There is no rule which renders a person who violates the duty to use due care to protect another person against injury bound absolutely to anticipate the commission of an independent act of negligence by a third person. * * * However, exceptions to the general rule are admitted within much greater freedom than where the intervening act was a wilful tort. The negligence of the first person in fault will be regarded as the proximate cause of an injury wherever the negligent acts of the subsequent wrongdoer are such as a man of ordinary experience and sagacity, in the position of the original wrongdoer and acquainted with all the circumstances reasonably should have anticipated. * * * According to some authority, no rule should go so far as to relieve one from responsibility for injuries resulting from his violation of safety statutes on the ground that the injuries might have been prevented by the exercise of ordinary care on the part of other persons. The theory of this view is that the enactment of a safety statute amounts to a legislative declaration that injury from the violation of the statute is reasonably to be anticipated."

Section 9 of 22 Am. Jur., Fires, upon which the defendants rely, says:

"It is well established that an owner of premises on which a fire accidentally starts is liable for the spread of the fire only if he has been guilty of some negligence in connection with its origin or escape * * * "

It will be observed that that statement does not say that the owner must not only be guilty "of some negligence in connection with its origin," but must also be the individual who applied the match.

The above will suffice as a review of the authorities cited by the defendants. We have not mentioned the facts recounted in every decision mentioned by them. We are satisfied that no authority cited by them holds that one who maintains upon his property a public nuisance is liable to a neighbor, whose property was consumed by a fire which originated in the accumulated tinder, only in the event that he himself set it afire.

It will be observed that the authorities upon which the defendants rely were principally concerned with the problem as to whether or not the intervening negligence of a third person who applied the match denied a causal connection between the negligently maintained premises of the owner and the destruction of his neighbor's property. In *Stone v. Boston & A. R. Co.*, supra, it was only because the court deemed Casserly's act a break in the causal connection that the railroad was saved from liability. In other words, if Casserly's negligent act had been one which the defendant should have anticipated, it would have been liable for the damage. We make that observation because of the defendant's apparent belief that the owner of property which is a public nuisance will be compelled to respond in damages only in the event that he himself set it afire.

Before considering whether Ellis Miller's conduct was an intervening act which the defendants were not required to anticipate, let us first turn to the principle which is stated thus in 22 Am. Jur., Fires, p. 602, § 12:

"The condition of the premises on which the fire originates, as being or not being conducive to fire, is an important factor in determining liability. Thus, the owner of property which is negligently left in such a condition that it is easy for a fire to catch thereon and to spread to neighboring premises, as by reason of combustible materials left unguarded, is ordinarily liable for damage done by a fire started thereon by him or his employees, although the fire starts by pure accident, or by an act which would not be negligent but for the condition of the premises. It has further been held that if the owner of premises allows them to remain in such a condition as to constitute a danger to other property in case of fire, this negligence will make him liable for damages done to such other property by an accidental fire starting on his premises, although he has no connection with its origin. However, in some jurisdictions * * *. The authorities are to the effect that the owner of premises on which are stored dangerous inflammable materials is liable for the destruction by fire of property on neighboring premises of another person, where such inflammable materials were negligently stored or were kept in such a manner as to constitute a nuisance, or to be in violation of a valid ordinance or statute, and where the destruction was the direct result of such wrongful storing. * * *."

We have read all of the authorities which the author cites in support of that statement. Those which he cites in support of the following:

"However, in some jurisdictions, permitting one's premises to remain in such a negligent condition as to make likely the communication of a fire

therefrom to other property does not make the owner liable for the spread of a fire which is occasioned by the act of a third person''

are *Stone v. Boston & A. R. Co.,* 171 Mass. 536, 51 N. E. 1, 41 L. R. A. 794, and *Lothrop v. Thayer,* 138 Mass. 466, 52 Am. Rep. 286.

We have already reviewed *Stone v. Boston & A. R. Co.,* supra. In the Lothrop decision, the defendant was a tenant at will who caused the leased premises to be destroyed by fire created through his negligence. The structure was, in part, occupied by the landlord. The decision held that the tenant must respond in damages to the landlord for the loss of that part of the structure which the landlord occupied; but not for the part occupied by the tenant. The court depended upon the rule that a tenant at will is not liable for negligent or permissive waste. But see *Zigler v. McClellan,* 15 Or. 499, 16 P. 179. Whatever may be the merits of the Lothrop decision, it clearly has no application to the situation before us, owing to the fact that the property for which it is sought to hold the defendants liable was not occupied by the defendants, but by third parties; that is, the plaintiff and his assignors.

We are satisfied that the authorities support the principle stated by American Jurisprudence, that the owner of property, which contains inflammable material and which threatens his neighbor's property with destruction, will be held liable in damages, even though neither he nor any of his employees start the fire. Let us take note of some of the decisions.

In *Standard Oil Co. of N. J. v. Midgett,* 116 Fed. (2d) 562, the defendant was held liable for the destruction of the plaintiff's property, notwithstanding the

fact that no one knew how the fire originated. It started upon the defendant's and destroyed both properties. The court held that since the defendant's building was unfit for the storage of oil, was dilapidated, was constructed of wood, and was highly inflammable, the doctrine of *res ipsa loquitur* was applicable.

In *Phillips Petroleum Co. v. Berry*, 188 Ark. 431, 65 S. W. (2d) 533, a part of the defendant's plant was a warehouse which was used for the storage of petroleum products. It was negligently maintained. A fire which broke out in this building shortly consumed the plaintiff's nearby dwelling house. While the doors of the warehouse stood open and no employees were present, a mentally defective boy entered and struck some matches. The fire started immediately after that incident. If the boy's visit and matches did not explain the origin of the fire, there was no explanation for it. The lower court refused some instructions requested by the defendant "that the act of the intruder, whoever he was, who set the fire was the efficient intervening cause of the resulting damage." The decision under review said of the requests:

> "These instructions were properly refused, for the act of the child in starting the fire was a contributing cause and had a direct causal connection with the original negligence. Where several causes combine to produce an injury, one is not relieved from liability because he is responsible for only one of these causes. It is sufficient to fix liability on him, if without his negligent act, the injury would not have occurred."

The court also held that the trial judge properly refused to instruct the jury that the defendant was not bound to anticipate the presence of trespassers in its warehouse.

In *Leahy v. Standard Oil Co. of N. Y.*, 224 Mass. 352, 112 N. E. 950, while one Sullivan was constructing a building which he intended to use as a public garage, the defendant's driver brought to the premises fifty gallons of gasoline and attempted to pour it into the building's tank. However, due to his carelessness, the driver spilled forty-five gallons which ran down to the floor of the cellar of the building where a steam heating plant was being installed. Seeing what he had done, the driver swept the spilled gasoline into a pit in the cellar, notwithstanding warnings that his act was improper. About a month after this incident had taken place, Sullivan, who was aware of the manner in which the spilled gasoline had been disposed of, ran water out of the boiler into the pit. The result of Sullivan's act, unbeknown to him, was to agitate the gasoline in the pit and cause it to vaporize. A few minutes later one O'Rourke, an employee of Sullivan, who knew nothing about the gasoline in the pit, entered the cellar for the purpose of stoking the furnace. When he opened the furnace door the vapor exploded and he was killed. The action under review was instituted by the administrator of his estate to recover damages, based upon charges that the defendant was responsible for the death. In sustaining a judgment for the administrator, the decision says:

"The rule laid down in Lane v. Atlantic Works is stated in these terms: 'In actions of this description, the defendant is liable for the natural and probable consequences of his negligent act or omission. The injury must be the direct result of the misconduct charged; but it will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended. The act of a third person, intervening and

contributing a condition necessary to the injurious effect of the original negligence, will not excuse the wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise.'

\* \* \*

''The doctrine of Lane v. Atlantic Works may well rest on the proposition that the third person's intervening act is in the contemplation of the law the act of the defendant if it is the natural and probable consequence of the defendant's act. In that case it is in the eye of the law the defendant's act because in the eye of the law every man is taken to have contemplated the natural and probable consequences of his acts \* \* \*. To make out negligence on the part of the defendant it is necessary for the plaintiff to prove that the natural and probable consequence of his act is that harm of the same general character as that which came to the plaintiff would be likely to come from it to persons who stood in the same general relation to the defendant as the plaintiff.''

In *Brown v. Standard Oil Co. of New York*, 247 Fed. 303, a tugboat owned by the plaintiff took fire when the water about it became covered with sludge acid, an inflammable substance discharged by the defendant's nearby refinery. How the sludge was ignited was unknown. A part of the defendant's refinery was a separator tank in which sludge acid, used in the refining of crude petroleum, was so handled that it yielded up the acid. A few minutes before the tugboat caught fire, one of the separator tanks overflowed, and when an employee saw the situation he shut the valve and then with a stream of water flushed off the surface

of the tank and the ground where the escaped sludge was. The sludge and the water ran together from the tank down a street gutter, across the street, into a sewer and then down the river to the plaintiff's boat. Ten minutes after the inflammable substance reached the river the fire occurred. The trial judge, in entering judgment for the plaintiff, said:

"* * * the proximate cause of the fire was some substance which surrounded the tug and which caught fire from a means that is not exactly shown, but which should reasonably have been anticipated; that the material came from the acid separator; that it was negligence to allow a stream of water to carry material from the top of these acid separators to the slip * * * ."

In affirming the judgment, the appellate court quoted that statement and held that the finding that the sludge caused the fire was not "mere conjecture."

*Prince v. Chehalis Savings & Loan Ass'n,* 186 Wash. 372, 58 P. (2d) 290, sustained a judgment for the plaintiff, based upon the destruction of his home by a fire which originated in a nearby vacant building owned by the defendant. The defendant was not the one which kindled the fire. The building owned by the defendant was in a state of dilapidation. It was frequented by children in the daytime and by tramps at night. Scattered about upon its floor was combustible material and the butts of cigarettes which itinerants had cast there. In sustaining the judgment for the plaintiff, the court said:

"It is first contended that the evidence failed to establish liability on the part of the appellant, because there was no evidence or finding as to the origin of the fire, it being claimed that that was a necessary element for the respondents to prove. The courts generally support the rule, in such a case as

that now before us, that evidence as to the origin of the fire is not a necessary element to entitle a recovery where the property causing the fire has gotten into such a condition that it creates a fire hazard, and that, if fire should occur in it, it is reasonably probable that it would spread to the adjacent property."

The above will suffice as a review of the decisions. More can be found in the annotation, 111 A. L. R. 1140, at 1148; and see also *Keyser Canning Co. v. Klots Throwing Co.*, 94 W. Va. 346, 118 S. E. 521, 31 A. L. R. 283.

■ We know of no decision which holds that one who maintains his property so negligently that it menaces his neighbors, is liable for the destruction of their premises by a fire which started upon his, only in the event that he himself applied the match. To the contrary, we are satisfied that the owner's negligence is the proximate cause of the damage to the neighbor, even if a stranger communicated the spark; unless the circumstances are such that no prudent person would have anticipated the stranger's act. Of course, inflammable material, such as lay upon the defendants' property, does not ignite spontaneously; an Ellis Miller is generally required. But this Ellis Miller would not have succeeded in starting this conflagration had it not been for the defendants' negligent conduct. The duty to refrain from littering one's premises with inflammable material is imposed for the protection of the neighbors, and a person who breaches that duty thereby creates a causal connection between his negligent act and his neighbor's loss if a fire starts among the debris. One who suspends a sword of Damocles over the head of his neighbor must respond in damages for the consequences if another, allured by the temptation,

cuts the tender cord. Section 2-407, O. C. L. A., lists as a disputable presumption: "That a person intends the ordinary consequences of his voluntary act; * * *" A property owner who places his property in the condition of the defendants' knows that he endangers his neighbor's property and the adjacent forest. He also knows that his property will allure the Ellis Millers with their matches and their cigarettes. If the thing happens, which generally happens under such circumstances, the law rightfully says that the negligent owner intended from the outset that it should happen.

It is true, as the defendants say, that § 107-228, O. C. L. A., makes it a misdemeanor for any one during the closed season to throw lighted tobacco into forest land. The careless, the heedless and the thoughtless are always with us. That is why we have fire departments and laws like § 107-228. One of the chores of the prudent is to be on the alert for the petty shortcomings of the imprudent.

■ We think that the issue before us is governed by the principle which is thus stated by § 449, Restatement of the Law, Torts:

"If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby."

■ We are satisfied that when the defendants littered their property with piles of combustible material it was their duty to anticipate trespasses by such persons as Ellis Miller, and also to anticipate that the intruders might cast about lighted tobacco.

When the defendants moved for an involuntary nonsuit the evidence did not disclose the origin of the fire.

It did, however, warrant a finding that the defendants maintained upon their property a public nuisance, as defined by § 107-208, O. C. L. A., and that the fire originated in the midst thereof. We believe that, as held in *Standard Oil Co. of N. J. v. Midgett,* the situation spoke for itself. The motion was properly overruled.

The instructions attacked by the defendants were based upon the proposition that, even if Miller started the fire, the defendants would be liable if they should have anticipated his conduct. Those requested by the defendants and not given were based upon the theory that Miller's act, being criminal in nature, need not have been anticipated and shielded the defendants from liability. It follows from the above that no error was committed in the instructions.

So far we have not considered whether the declaration which the defendants say Miller signed should have been received as evidence. We deem that issue immaterial because the defendants were liable, whether or not Miller's cigarette butts started the blaze. In other words, had the written declaration been received, we would not be compelled to reverse the judgment entered in the circuit court.

Having embraced the foregoing principles of law, it necessarily follows that no error was committed when the motion for a directed verdict was denied.

The challenged judgment is affirmed.