505 A.2d 131

**Evangelos ORFANOS, et al**

v.

**ATHENIAN, INC., et al.**

**No. 432, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

March 5, 1986.

Harvey Greenberg (Kent L. Greenberg, on brief), Baltimore, for appellants.

Michael S. Radcliffe (M. Stanley Radcliffe, Dennis J. Sporas, Radcliffe & Radcliffe, P.A., on brief), Towson, C. MacNair Speed, Baltimore, for appellees.

Argued before GILBERT, C.J., and WILNER and ADKINS, JJ.

WILNER, Judge.

On April 27, 1982, a fire erupted at the Athenian Restaurant at 4700–02 Eastern Avenue in Baltimore, substantially damaging both the restaurant furnishings and equipment and the buildings in which they were housed. The buildings were owned by appellants Evangelos and Mary Orfanos; they were leased to appellees Spiros Stavrakas and James Gianakos, who, through their corporation Athenian, Inc., owned and operated the restaurant. In force at the time of the fire was an insurance policy purchased by Athenian, Inc. and written by St. Paul Surplus Line Insurance Company (St. Paul). The policy provided fire insurance coverage on the contents of the restaurant and liability coverage with respect to personal injury or property damage caused by Athenian, Inc. Appellants had a separate fire insurance policy on the buildings.

In September, 1982, appellants filed an action in equity against Stavrakas, Athenian, Inc. and St. Paul, alleging, among other things, that the fire was due to hazardous conditions which the defendants failed to correct, that the existence of those conditions constituted both negligence and a breach of the lease, that, in contravention of the lease, the defendants had failed to restore the premises and had announced their intention to vacate it, that the defendants had made claim to St. Paul for their losses, and that, if they received payment, they were "unlikely to apply said insurance proceeds to the restoration of said personal property." Appellants asked for a declaratory judgment that the lease remained in effect and for the appointment of a trustee to collect the insurance proceeds from St. Paul. Although it does not appear that any relief was ever granted to appellants in that action, it sufficed to preclude St. Paul from actually paying the fire insurance proceeds to its insureds.

In January, 1983, appellants dismissed the equity action and filed, in place of it, a three-count declaration at law against Stavrakos, Gianakos, Athenian, and St. Paul. All

three counts were based on the underlying claim that the fire resulted from hazardous conditions around the cooking units. Count I charged breach of the lease; Count II charged negligence; and Count III charged intentional and malicious destruction of property. Those counts, of course, sought money damages. In a separate claim at the end of the declaration, however, appellants sought an injunction restraining St. Paul from distributing the proceeds of its policy. In support of that claim, they incorporated the averments of Counts I, II, and III, and stated that Athenian, Inc. was "no longer a viable business entity," that the right to collect the insurance proceeds was its only asset, and that the defendants would render those proceeds "inaccessible" if paid to them.

Three pertinent things occurred thereafter: (1) at some point, St. Paul filed an interpleader and deposited the fire insurance proceeds in court; (2) appellants filed an amended, and then a two-count second amended, declaration, alleging breach of the lease and negligence but abandoning the intentional injury claim; and (3) Athenian, Inc. filed a counterclaim (and then an amended counterclaim) against appellants contending that, by filing the actions against St. Paul and thereby causing St. Paul not to pay the fire insurance proceeds to it, appellants had intentionally and maliciously interfered with its insurance contract. The proceedings terminated in the Circuit Court when (1) on June 7, 1984, the court sustained appellants' demurrer to the amended counterclaim without leave to amend and (2) on March 28, 1985, after a non-jury trial, the court found no liability under the second amended declaration and therefore entered judgment thereon for appellees.

Neither side is pleased with its loss, and so we have cross-appeals. Appellants complain that certain of the court's critical findings and conclusions are erroneous and that the court erred in striking certain rebuttal testimony. Athenian, Inc. believes that its amended counterclaim stated a cause of action.

## I. *Complaints By Appellants*

The gravamen of appellants' action, as set forth in their second amended declaration, both as to the breach of lease and negligence counts, was that the fire resulted from hazardous conditions which appellees created and allowed to remain in the vicinity of the cooking units. Count I of the second amended declaration states that, in contravention of the lease appellees "carelessly allowed dangerous conditions to exist in and about the cooking units upon the demised premises" and that "as a direct and proximate result of [appellees'] breach of the aforesaid Lease Agreement, a fire did occur upon the demised premises" on April 27, 1982, causing damage to the buildings. Count II was a bit more specific in describing the dangerous conditions—permitting the cooking units to remain in a state of disrepair by allowing an accumulation of cooking grease, failing to clean the hood and duct area "of said units" with sufficient frequency, failing to inspect the automatic dry chemical extinguishing system on a regular basis, failing to have fire extinguishers in the immediate vicinity of the cooking units, and failing to disconnect unused cooking units from the power sources—but it too alleged that the breach of these "duties" "directly and proximately resulted in the aforesaid fire on the demised premises."

There were a number of issues and sub-issues raised at trial, but it is fair to say that appellees' principal defenses were that (1) they *had* regularly cleaned and attended to the cooking units and the hood and duct located directly above those units, and (2) in any event, the fire did not start in or near the cooking units, and, thus, any accumulation of grease in or about those units or in the hood or duct was not the cause of the fire. The court accepted the second of these defenses, finding that "the fire probably originated in an area that would not be directly affected by the cooking grease," and that, as a result, appellants had not met their burden of proof on the issue of causation—whether the fire resulted from the conditions alleged to exist in or around the cooking units. Although early in its oral opinion, the

court, referring to Count I, indicated that "[t]he contract action basically seems to have been abandoned" as there was "[v]ery little testimony" as to that count, it seems clear in context that the ruling on Count I was not based on abandonment as much as on appellants' failure to meet their burden of proof as to causation.

Appellants make two complaints about that finding: first, they argue that it was clearly erroneous on the facts; second, they contend that, even if the fire did not start in or near the cooking units, the accumulation of grease in the vicinity of those units caused the fire to spread or become more severe than otherwise would have been the case, which itself is actionable. We find some merit in the second contention.

We shall avoid the temptation to recount all of the voluminous and conflicting evidence as to how and where the fire started and spread, for it really is not necessary. A quick summary will suffice. The restaurant was located on the corner of Eastern Avenue and Newkirk Street. It was divided, essentially, into three parts. The first part was the dining area, which patrons entered from Eastern Avenue. In back of the dining area was the kitchen, and behind that was a freezer and storage area. Each part was separated from the adjoining part by a wall that ran from the Newkirk Street side of the building partway across the width of the restaurant; because these walls did not extend all the way across, there was access from one area to another on the right-hand side.

Two ventilation systems served the restaurant, one serving the dining room, the other serving the kitchen. The dining room system consisted of two rectangular-shaped ducts suspended about six inches below the ceiling, one along the right wall and the other about one-third distant from the left (Newkirk Street) wall. These ducts ran back to the kitchen and then joined a rectangular duct that ran perpendicularly and vented through the Newkirk Street wall.

The second system consisted of a hood suspended from the ceiling directly over the cooking units and a round duct that ran through the back wall of the kitchen into or toward the storage area, then turned up through the ceiling, and eventually vented through the roof near the back wall of the building.[1]

There was evidence that these two systems were entirely separate from each other and did not interconnect. Although parts of both systems ran through the kitchen and therefore were in somewhat close proximity, they were at different locations and elevations and did not abut each other. The part of the dining room system that ran along the right wall of the dining area had been rendered dysfunctional by a baffler that a former tenant had placed at the point where the other duct coming from the dining room joined the perpendicular duct in the kitchen.

There was no evidence establishing precisely where, or how, the fire started. There was some evidence, however, to show that it either commenced or initially was confined in that part of the dining room ventilation duct running perpendicularly near the kitchen ceiling toward Newkirk Street. From that evidence, coupled with the layout of the two systems, the court could reasonably infer that the fire was not ignited by any grease accumulated in or about the cooking units or the ventilation system serving those units. Accordingly, notwithstanding some evidence to the contrary, the court's finding to that effect was not clearly erroneous. Md. Rule 1086.

As noted, appellants alternatively contend that, even if the grease accumulated in the ventilation system serving

---

1. Although the record is not entirely clear on this point, it would seem that, behind the kitchen, there was an entranceway from Newkirk Street that led to the upstairs apartments above the restaurant. The entrance hall and stairwell apparently separated the kitchen from the storage area, and thus the wall behind the cooking units was actually the stairwell wall. The duct from the cooking units apparently extended about six feet through the stairwell area into the storage area, and then turned upward.

the cooking units did not cause the fire to ignite, it contributed to the spread and ferocity of the fire and therefore was a proximate cause of the ultimate damage suffered. They argue that liability may exist for creating a hazardous condition that enables a fire to spread or to become especially dangerous, even if that condition did not actually cause the fire initially to ignite.

■ This was not the theory actually pled by appellants, and indeed it was not the theory that they sought to prove. The charge made, and the charge sought to be proved, was that the fire was started by the *ignition of grease* in the hood and duct over the cooking units. This alternative theory was, however, presented to the court in argument, considered by the court, and rejected on its merits. It is therefore properly before us for review. Md. Rule 1085.

■ The court accepted the premise that a person who allows a fire hazard to exist on his property may be liable for damage caused to others by a fire emanating from his property if (1) the hazardous condition contributed to the spread or ferocity of the fire and (2) it was reasonably foreseeable that the condition might so contribute. It concluded, however, that, because appellants failed to show how the fire started, they failed in their burden of proving the requisite element of foreseeability. We think that the court erred in reaching that conclusion. Proof of foreseeability does not depend on proof of how the fire started.

The one Maryland case in this area of law is *Texas Company v. Pecora,* 208 Md. 281, 118 A.2d 377 (1955). The defendant company owned a gasoline storage tank that was once used in connection with a service station. When the dealership agreement was terminated, the company permitted the dealer to have the tank removed from the ground. The dealer did, indeed, have it removed to a nearby lot where children often played. The tank was left in a dangerous condition; there was some residue of gasoline in it and the vent pipes were not capped. The tank exploded and several children playing in the area were injured when one

of the children ignited a puddle of gasoline that had escaped from the tank. Affirming judgments against the company, the Court held at 292, 118 A.2d 377:

"The jury could have found from the evidence that these tanks were known to the Texas Company to be highly dangerous if brought in contact with sparks or fire. It could have found that there were safety measures well known to the Texas Company whereby the tanks could be rendered harmless. It could have found that the Texas Company knew that the tanks must be moved and that it took no action to render them safe for removal. The jury could have found that the Texas Company should have foreseen that others ignorant of the danger might remove them and leave them in an unsafe condition. The jury could have found from the evidence that the Texas Company should have foreseen that these tanks thus exposed and dangerous would constitute a hazard to others and that the explosion which occurred in this case was a reasonably foreseeable result. Such finding by the jury would establish the negligence of the Texas Company."

The Court then rejected the argument that either the removal of the tanks to another property by the dealer or the ignition of the gasoline by the child constituted an intervening cause sufficient to break the chain of causation. Both events, said the Court, were "links in a chain of foreseeable circumstances." *Id.*, 294, 118 A.2d 377.

It is true, as the Circuit Court here pointed out, that in *Texas Company v. Pecora,* the immediate cause of the explosion was known, and thus the Court could determine whether that event was a reasonably foreseeable one. But the caselaw generally does not require that the immediate cause be known.

In *Prince v. Chehalis Savings & Loan Ass'n,* 186 Wash. 372, 58 P.2d 290 (1936), the defendant owned a garage which, by reason of its state of disrepair, saturation with grease and oil, and openness to children and vagrants, had

become a fire hazard. A fire of unknown origin erupted in the garage, spread to an adjoining property, and spread from there to the next adjoining property, owned by the plaintiffs. Recovery was affirmed, the Court holding at 292:

> "It is first contended that the evidence failed to establish liability on the part of the appellant, because there was no evidence or finding as to the origin of the fire, it being claimed that that was a necessary element for the respondents to prove. The courts generally support the rule, in such a case as that now before us, that evidence as to the origin of the fire is not a necessary element to entitle a recovery where the property causing the fire has gotten into such a condition that it creates a fire hazard, and that, if fire should occur in it, it is .reasonably probable that it would spread to the adjacent property."

A similar result was reached in *Chicago, Milwaukee, St. Paul & Pacific R. Co. v. Poarch*, 292 F.2d 449 (9th Cir. 1961). There too the plaintiffs, whose property was damaged by the spread of a fire emanating from the defendant's property, claimed that the defendant had been negligent in allowing its property to become a fire hazard. The specific cause and origin of the fire were unknown. Applying Washington law and, in particular, the *Prince* case, *supra,* the Court affirmed a judgment for the plaintiffs, holding, at 451:

> "[O]nce it is established that the owner of a building has negligently allowed it to become a fire hazard and a fire does start[,] the actual cause—whether deliberate, accidental, or an act of God—is immaterial. The negligence is not in the ignition of the fire but rather it is in allowing a condition to exist which will be reasonably likely to cause injury to another *if* a fire does start."

(Emphasis in the original.) *See also Reid & Sibell, Inc. v. Gilmore & Edwards Company*, 134 Cal.App.2d 60, 285 P.2d 364 (1955), *Levy-Zentzer Co. v. Southern Pac. Transportation Co.*, 74 Cal.App.3d 762, 142 Cal.Rptr. 1 (1977), *Empire State Bldg. Co. v. Bryde*, 211 Neb. 184, 318 N.W.2d

65 (1982), *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179 (8th Cir.1972), *cert. denied* 410 U.S. 930 (1973), *Menth v. Breeze Corporation,* 4 N.J. 428, 73 A.2d 183 (1950), and *Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111 (1977), where, in each instance, the Court held that liability based on the maintenance of a hazardous condition could arise notwithstanding a failure to prove how the fire started.

The lack of explanation as to how the fire ignited is treated no differently than proof that someone other than the defendant set the fire, which, the cases tell us, does not necessarily exonerate the defendant from liability based on maintaining a hazardous condition. *See Arneil v. Schnitzer,* 173 Or. 179, 144 P.2d 707 (1944); *B.W. King, Inc. v. West New York,* 49 N.J. 318, 230 A.2d 133 (1967). *Compare Comfort v. Stadelman Fruit, Inc.,* 285 Or. 525, 592 P.2d 213 (1979), and *Mermod, Jaccard & King v. Hellmuth, Obata, Etc.,* 615 S.W.2d 93 (Mo.App.1981).

It is true, of course, that foreseeability of the harm is a necessary element of the cause of action. But in judging foreseeability, the focus is not on whether the particular event that occurred was expectable, but rather on whether the event "fell within a general field of danger which should have been anticipated." *Segerman v. Jones,* 256 Md. 109, 132, 259 A.2d 794 (1969), quoting from *McLeod v. Grant County School Dist.,* 42 Wash.2d 316, 255 P.2d 360 (1953). As further explicated in Harper (*A Treatise on the Law of Torts,* § 7 (1933)), quoted in *Moran v. Faberge,* 273 Md. 538, 551, 332 A.2d 11 (1975):

"... 'the courts are perfectly accurate in declaring that there can be no liability where the harm is unforeseeable, if *"foreseeability" refers to the general type of harm sustained.* It is literally true that there is no liability for damage that falls entirely outside the *general threat of harm* which made the conduct of the actor negligent. *The sequence of events, of course, need not be foreseeable. The manner in which the risk culminates in harm may be unusual, improbable and highly unexpectable,*

*from the point of view of the actor at the time of his conduct. And yet, if the harm suffered falls within the general danger area, there may be liability, provided other requisites of legal causation are present.'* "

(Emphasis added by the *Moran* Court.) *See also Dalmo Sales of Wheaton v. Steinberg,* 43 Md.App. 659, 407 A.2d 339, *cert. denied* 286 Md. 745 (1979).

It is reasonably foreseeable that a fire can start in the kitchen of a restaurant; such fires are not infrequent. Although the precise cause of a particular fire may be unusual, improbable, even unpredictable, the general danger is apparent and therefore foreseeable. Thus, the fact that the particular fire that caused the damage alleged here may not have started in or about the cooking units or the ventilation system serving them is by no means determinative. If there was an accumulation of grease in that system sufficient to constitute an unreasonably hazardous condition and if that grease caused a fire started elsewhere to spread and therefore cause damage that would not otherwise have been caused, liability would exist.

What is not so clear is whether there was, in fact, a hazardous condition in the first instance. On that issue, the evidence was in considerable dispute. Appellants' evidence showed that there was indeed a hazard that was known to appellees, that there was a significant accumulation of grease in and about the cooking units and the ventilation system serving them, that that system was infrequently and inadequately cleaned, that the ignition of grease will cause a fire to spread, and that the fire actually traveled through the suspect ventilation system. Appellees produced evidence to the contrary—that the ventilation system was regularly and adequately cleaned and was not a hazard.

Because the court decided the matter based on appellants' failure to establish the cause or origin of the fire, it never resolved this evidentiary conflict; it therefore never decided whether there *was* an underlying hazard or, if there was, whether the creation or maintenance of that hazard contrib-

uted in any significant way to the damage caused to the buildings. We shall remand this case so that the court may resolve those open issues which, it would seem, it can do from the evidence already before it.

The one remaining issue in appellants' appeal concerns the rebuttal testimony of Barbara Wilson, which the court initially allowed and then struck.

■ Michael Olewack, a professional steamcleaner called by appellees, testified that he examined the ventilation system servicing the cooking units in March, 1982—about a month before the fire—and concluded that it did not require immediate professional cleaning. There was a "light accumulation of grease" but it "wasn't a major concern where you have to worry about a fire or anything. It wasn't dripping. It wasn't loose. It seemed relatively clean." As part of his inspection, Olewack examined the exhaust fan on the roof. He said that it wasn't dripping grease and that it "didn't have any tremendous accumulation of grease."

In an effort to rebut that testimony, appellant called Ms. Wilson, who had been a tenant in an apartment on the second floor of the building in 1981 and 1982. She stated that, when she first moved in, she used to hang wash near where the pipe that was part of the cooking unit exhaust exited, but that she had to stop doing so because of grease spitting out from the pipe. She stopped going to that area after about a month. That testimony was designed to show that the ventilation system was *not* clean, as stated by Mr. Olewack. The problem, however, is that Olewack described the condition of the system in March, 1982; Ms. Wilson described a condition some 11 to 12 months earlier. Her testimony therefore did not really rebut that of Mr. Olewack, and we find no error in the court's ultimate exclusion of it.

## II. *Athenian's Amended Counterclaim*

Athenian's action for intentional interference with its insurance contract was based on the following averments: (1) the policy provided two forms of coverage—coverage on

the contents of the restaurant and liability coverage, (2) under the liability coverage St. Paul became liable for all sums which Athenian was obligated to pay as damages because of bodily injury and property damage, (3) appellants were aware of the liability coverage, which was greater in amount than that required by the lease, (4) they nevertheless sought through judicial proceedings to restrain St. Paul from paying to Athenian, Inc. the proceeds of the coverage on contents, (5) as a result of their filing suit against St. Paul, the company refused to release to Athenian, Inc. the funds due under the contents coverage but paid them instead into court, and (6) after the funds were paid into court, appellants refused to agree to their release to Athenian, Inc.[2]  By these actions, Athenian alleged, appellants intentionally, maliciously, and with evil intent to injure Athenian, Inc., induced St. Paul to breach its contract of insurance.

The gravamen of the counterclaim, then, is, knowing that by virtue of the liability coverage there was a fund available to protect them, appellants nevertheless, by the filing and maintenance of judicial proceedings, effectively stopped (for a time) St. Paul from discharging its contractual obligation to Athenian, Inc.

The tort, as it exists in Maryland, has been described thusly: "a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663 (1984); *Vane v. Nocella*, 303 Md. 362, 383 n. 6, 494 A.2d 181 (1985).

---

**2.** Although not alleged in the amended counterclaim, the record reveals that the funds paid into court were eventually released to Athenian, Inc. in December, 1983, when appellants failed to respond to St. Paul's interpleader action.  The amended counterclaim does not state when Athenian, Inc. first filed its proof of loss and made claim for payment from St. Paul.

This is not substantially different from the description set forth in Restatement (Second) of Torts § 766:

"One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

The point at issue here is whether, assuming the facts to be as averred, appellants acted "without legal justification" or, as stated in the Restatement, *supra,* "improperly" in attempting by judicial action, to block the payment to Athenian, Inc., and thus to interfere with Athenian's rights under its insurance contract. There can be little doubt that the other elements of the tort—an existing contract and intentional interference with Athenian's rights under it—have at least been pled. The question is whether appellants' acts were without legal justification and thus improper.

In this regard, Restatement (Second) of Torts § 767 is instructive. It provides:

"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties."

In Comment k to § 766, the Restatement notes that "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." Several methods are discussed in a Comment to clause (a) of § 767, among them the prosecution of civil suits. That Comment states, in relevant part:

"In a very early instance of liability for intentional interference, the means of inducement employed were threats of 'mayhem and suits,' and both types of threats were deemed tortious. Litigation and the threat of litigation are powerful weapons. When wrongfully instituted, litigation entails harmful consequences to the public interest in judicial administration as well as to the actor's adversaries. The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation *or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication.* (See §§ 674–681B)." (Emphasis added.)

■ The reference to §§ 674–681B is to the chapter of the Restatement dealing with the wrongful use of civil proceedings. That reference is illuminating in a number of respects. Although the mere reference to those sections does not imply that an action for wrongful interference with contractual obligations based on a frivolous lawsuit is dependent upon proof of each element of the independent tort of malicious use of process, it does serve to remind us that the law does not view with favor the improper use of judicial process. It also provides a basis for not applying the privilege, or immunity, that attends in defamation cases. Although a suitor is privileged with respect to defamatory statements contained in pleadings, he is not similarly privileged to abuse or maliciously use civil process. *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 494 A.2d 200 (1985).

The Maryland Court of Appeals recognized and applied the general principle articulated in the Restatement Comment, in a somewhat analogous context, in *Gore v. Condon,* 87 Md. 368, 39 A. 1042 (1898). The plaintiff there sued for malicious interference with her property. She alleged that the defendant had fraudulently obtained by assignment a mortgage on her property that the defendant knew was void, that he nevertheless proceeded to obtain an *ex parte* decree of foreclosure under an "assent to sale" clause in the mortgage and caused her tenants to stop paying their rent to her, that, despite her appeal from that decree, he caused the property to be sold and had her tenants evicted, and that the appellate court eventually found the mortgage to be void and reversed the decree.

The Court was careful to observe that the action was not for malicious prosecution of a civil suit but for consequential damages arising from "a wrongful interference by defendant with the property of the plaintiff." *Id.,* 375, 39 A. 1042. It held that a cause of action was stated. With apparent reference to the averments concerning the plaintiff's tenants,[3] the Court concluded at 376, 39 A. 1042, that "[t]he right to maintain the action can also be sustained, upon the doctrine that a man who induces one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong." *See also Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 305–09 (Utah 1982), holding that liability for intentionally interfering with the plaintiff's "economic relations by improper means" may arise from forcing the plaintiff to defend groundless lawsuits. *Id.,* 308–09.

---

**3.** See the Note to *Gore v. Condon* written by William T. Brantley, former Reporter to the Court of Appeals, beginning at 87 Md. 739. Brantley regarded the Court as holding "that the owner of houses has a right of action against a third party who by his interference causes the tenants to refuse to pay their rents. . . ." *Id.*

■ Viewing the amended counterclaim in the light of these principles, we think that, while the pleading could have been more complete and precise, it nevertheless sufficed to state a cause of action. It implicitly, if not explicitly, charged appellants with deliberately causing St. Paul to withhold payment of funds due to Athenian, Inc. under the insurance contract without legal or economic justification. Any damages that appellants might be entitled to recover against Athenian, Inc., it charged, were covered by the liability provisions of the St. Paul policy, and therefore appellants had no need or legitimate right to sequester the proceeds due to Athenian. That suffices, in our judgment, to state a case of wrongful interference with contract.

JUDGMENTS ON SECOND AMENDED DECLARATION AND AMENDED COUNTERCLAIM VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE ASSESSED ONE–HALF AGAINST APPELLANTS, ONE–HALF AGAINST APPELLEES.