**In re PRESTON TRUCKING CO., INC., Debtor.**

**Preston Trucking Co., Inc., Plaintiff,**

**v.**

**Liquidity Solutions, Inc., et al., Defendants.**

**Bankruptcy No. 99–5–9994–JS.**
**Adversary No. 01–5293–JS.**

United States Bankruptcy Court, D. Maryland.

April 8, 2005.

Stephen E. Leach, Tucker, Flyer, et al., Washington, DC, for debtor.

*MEMORANDUM OPINION GRANTING CROSS–CLAIM OF LIQUIDITY SOLUTIONS, INC. IN PART AND DENYING THE CROSS–CLAIM OF THE TEAMSTERS*

JAMES F. SCHNEIDER, Bankruptcy Judge.

A number of former employees of Preston Trucking Company ("Preston Trucking"), the debtor in possession, assigned their priority wage claims and claims under the Worker Adjustment and Retraining Notification Act (the "WARN Act") to Liquidity Solutions, Inc. ("LSI"), which had solicited each truck driver for that purpose. The employees who assigned their claims to LSI ("the employees") received $0.35 on the dollar for their claims. Thereafter, Preston Trucking settled with the truck drivers' union the workers' vacation claims, contractual grievance claims and WARN Act claims for a lump sum of $18,443,501.00. The workers were each assigned a portion of this settlement based

on their outstanding vacation pay, contractual grievances and WARN Act damages. This settlement was given priority in the plan and money was available to pay the settlement in full, a highly unusual result in a bankruptcy case.

Thereafter, the Teamsters National Freight Industry Negotiating Committee (the "TNFINC" and "Teamsters"), various Teamster Local Unions and 88 of the debtor's former employees,[1] contested the validity of the assignment of claims from the employees to LSI, asserting that they were procured in violation of ethical rules, local rules and labor law and/or by fraud and misrepresentation. Not wishing to be subjected to liability for multiple claims against the same fund, the debtor, Preston Trucking, filed the instant complaint and amended complaints for interpleader [PP. 1, 2 and 6] against LSI, the Teamsters and the employees to resolve the conflicting rights of ownership of the claims and the right to receive a distribution from the bankruptcy estate in the amount of $220,083.11. The Teamsters and LSI filed answers [PP. 4 and 7] and cross-claims against each other [PP. 4 and 10].

The Teamsters filed motions for partial judgment and summary judgment [PP. 14 and 21] and LSI filed a motion for partial judgment [P. 18], all of which were denied by this Court by order [P. 46] entered February 21, 2002. Preston Trucking was dismissed from the action upon its deposit of the sum of $220,083.11 into the registry of the Court. Trial was held on the cross-claims of the Teamsters and LSI and the decision was held *sub curia.* Thereafter, LSI filed a motion to admit newly-discovered evidence [P. 52], which this Court granted by order [P. 59], entered April 29, 2003.

## FINDINGS OF FACT

According to its disclosure statement, Preston Trucking was one of the 25 largest interstate motor freight carriers in the United States in 1999. In July 1998, Preston Trucking obtained working capital financing from Congress Financial Corporation ("CFC"), secured by liens on receivables, rolling stock and other property, excluding real estate. During the ensuing year, Preston Trucking encountered financial difficulties and CFC declined to extend additional credit to deal with problems caused by the company's unexpectedly poor performance. Negotiations between the debtor and lender failed, and on July 26, 1999, Preston Trucking ceased all operations, closed its plants and effected a mass layoff of all employees. On the same date, it issued

1. Charles Aguirre, Michael Aliff, Robert E. Allen, Carl Baker, Anthony Barbosa, Andrew Bates, Jr., John W. Bell, Bernard Bier, James Bowers, Harold Brinkley, William Brooks, Jerry Brown, William P. Buchan, Elwood Buchanan, Gordon R. Burkins, Richard Butcher, Barry J. Ceryance, Stephen Childress, Jeffrey Clayton, Anthony Costanzo, Robert Cunningham, Thomas V. Davis, Nicholas Decanto, Max Dinges, Billey Doane, John Drayer, Wayne Dunn, Robert Ecrement, Terry J. Edwards, Melvin L. Finney, Tony W. Flynn, William Fox, Jeffrey Fraites, Louie Furlow, Jason D. Gallion, David Graves, Paul Gutowski, Paul W. Hall, Jr., Roger Hamberger, Raymond Hawkins, Sergio Hermida, Gary Hillyard, Myron Hobbs, Brian Holstlaw, Webb Horton, Salvatore Innace, James R. Jackson, Charles James, Kevin D. Johnson, Timothy Kavanaugh, Robert Keller, Arthur Kennedy, James Kenney, Michael F. Langille, Loren R. Lee, Gary R. Lehr, Clyde Lentz, Gary Lepine, Joseph Maclellan, Joseph Manasia, Anthony J. Mayer, Fred L. Mckeney, Michael Pontoriero, Bryan C. Reese, Stanley E. Ricketts, Alfred Rinna, Stuart L. Sears, Raymond D. Smeltzer, James B. Smith, Michael Sookoo, Paul Starr, Daniel Stephens, Ronald Stofano, Stephen E. Stoj, Joseph Taggart, Kenneth Thurman, John W. Todd, Paul E. Trott, Barry Uncapher, Michael Van Oss, Patrick Walcott, Stephen Walden, Mardy Walters, Patrick Watt, Timothy Wilson, Erik Wright, Gary Yoakam and Robert Ziemba.

notices to approximately 600 union and non-union truck drivers under the WARN Act that it was going out of business. On July 30, 1999, Preston Trucking filed a voluntary Chapter 11 bankruptcy petition in this Court.

The evidence demonstrates that on August 12, 1999, the International Brotherhood of Teamsters (the "IBT") filed a notice of appearance in the Preston Trucking bankruptcy case on behalf of the TNFINC, various Teamster Local Unions and the debtor's former employees. Teamsters' Exhibit 15. However, this entry of appearance does not appear on the docket in the Preston Trucking bankruptcy case. On February 7, 2000, Frederick Perillo filed a motion to appear *pro hac vice* on behalf of the IBT in the bankruptcy case. On February 14, 2000, this motion was granted by order. On February 15, 2000, Kimberly Bradley entered her appearance on behalf of the IBT in the bankruptcy case. Neither attorney entered their appearance on behalf of any individual employees. Between October 12, 1999 and January 19, 2001, twenty-three union members executed powers of attorney to counsel for the IBT to settle and dispose of their claims and to accept distributions on their behalf. Teamsters' Exhibit 19. These powers of attorney are not reflected on the docket and counsel for the Teamsters never entered their appearances on behalf of these individuals specifically in the bankruptcy case.

On November 22, 1999, the IBT filed Proof of Claim No. 5477 in the amount of $58.6 million for wages and damages under the WARN Act on behalf of the union employees.[2] On November 30, 1999, non-union employees filed Complaint No. 99–5830 against the debtor, styled *Adams, et al. v. Preston Trucking Co., Inc.*, asserting claims for wages and damages under the WARN Act. On January 31, 2000, the debtor filed objections [PP. 391 and 392] to the claims of the non-union employees and union employees. On March 6, 2000, by order [P. 463], the debtor's objections to the claims of both the non-union and union employees were consolidated with the complaint of the non-union employees. On March 12, 2001, as evidenced by a Consent Order [P. 50] entered in Adversary Proceeding 99–5830, the Teamsters and Preston Trucking reached agreement on the vacation pay claims, contractual grievance claims and WARN Act claims, by which the Teamsters settled all claims in the case (that were not previously decided in arbitration proceedings) for a lump sum of $18,443,501.00. This settlement was incorporated into the debtor's First Amended Plan of Liquidation (the "Plan") [P. 854], which was approved by an order of this Court dated April 13, 2001 [P. 1128].

Section 1.51 of the Plan defines a "Union Employee Claim" as any claim arising from a collective bargaining agreement or the WARN Act, and designates the Union Employee Claims as "Class 3 Claims." Section 4.3(b) of the Plan, Union Employee Claims, provides that the "aggregate sum to be paid to holders of allowed claims in Class 3 shall be distributed in accordance with (I) Exhibit C to this plan, with such adjustments as determined by IBT, with respect to each holder of an allowed claim in Class 3 who was a member of IBT." Section 4.3(b) reiterates that the sum was

---

**2.** The union members are all parties to collective bargaining agreements. The various agreements contain similar provisions making the union the exclusive representative of the employee in disputes with the employer. *See* Teamsters Exhibits 1A–1L (The National Master Freight Agreement and its regional supplements and other collective bargaining agreements between Preston Trucking Company and affiliates of the International Brotherhood of Teamsters).

intended to cover WARN Act claims and "claims arising under any collective bargaining agreement."

Exhibit C to the Plan assigns individual amounts from the settlement fund to each union employee for their vacation pay, contractual grievances and WARN Act damages. Stephen E. Leach, attorney for the debtor, declared in his affidavit that, "Although the initial allocation of the amounts to each member was included in the Plan, the Teamsters union reserved the right to alter these amounts, and did in fact exercise that authority on literally hundreds of occasions." Declaration of Stephen Leach, dated May 8, 2003, excerpt from ¶ 3. Stephanie Irene Lovell Lee, Manager of Administration at Preston Trucking, provided examples of these alterations at trial, testifying that the IBT added $100 to every full time worker's WARN Act amount and $50 to every casual employee's WARN Act amount to the amounts contained in Exhibit C to the Plan.

Stephen Leach testified at trial that the Plan was consummated in May or June of 2001. Although a distribution was made to a majority of the workers at that time, the debtor elected to retain the monies due to the employees who had assigned their claims to LSI and to file a complaint for interpleader against the Teamsters, the employees and LSI to resolve the conflicting rights of ownership of the claims.

LSI is in the business of buying and selling claims in bankruptcy cases. Robert Minkoff ("Minkoff") is vice president of LSI and an attorney. In mid to late 1999, Minkoff became aware of the Preston Trucking bankruptcy and the possibility of a distribution to creditors. After conducting research about the case, Minkoff decided to contact creditors on behalf of LSI with the intention of purchasing their claims. Accordingly, Minkoff ordered the debtor's Schedule E from the Bankruptcy Court that identified the names, addresses and priority claim amounts of the debtor's former employees. Schedule E listed individual employees, not the Teamsters, as the holders of the priority claims. Minkoff testified at trial that he had no knowledge of the details of the WARN Act litigation when deciding to solicit the employees of Preston Trucking.

In late 1999 and again in 2000, LSI sent approximately 1,000 letters to former employees of Preston Trucking who held priority wage claims of $1,000 or more, proposing to purchase their claims for 35¢ on the dollar. The mailing of the letters constituted the only contact with the individual defendants that was initiated by LSI, other than the answering of telephone calls placed to LSI by some of the claimants who had received the solicitations by mail. Using LSI's stationery, Minkoff wrote solicitation letters that stated in pertinent part: "We are writing to express our interest in indicating a bid for your unsecured, allowed and undisputed claim in the above-referenced case." The letters included proposed form assignments that LSI alleged have been in standard use in the distressed trading market for at least ten years. The assignments included various standard representations and warranties, including the following: "Assignor owns and has title to the Claim free and clear of any and all liens, security interests or encumbrances of any kind or nature whatsoever." [3]

---

**3.** The full text of one such Assignment is set forth below:

Allen, Robert E., having offices at 134 Charleston Rd., Mercer, PA 16137, in consideration of the sum of $947.73 ("Purchase Price") does hereby transfer to Liquidity Solutions, Inc., as agent ("Assignee") having offices at One University Plaza, Suite 518, Hackensack, NJ 07601 all of the Assignor's right, title and interest in and to

the claim or claims of Assignor, as more specifically set forth (the "Claim") against Preston Trucking Company, Inc., Debtor in the bankruptcy case (the "Proceedings") in the United States Bankruptcy Court for the District of Maryland (the "Court"), Case No. 99–5994 (the "Debtor") in the currently outstanding amount of not less than $2,707.81 and all rights and benefits of the Assignor relating to the Claim, including without limitation the Proof of Claim identified below and the Assignor's rights to receive interest, penalties and fees, if any, which may be paid with respect to the Claim, and all cash, securities, instruments and other property which may be paid or issued Debtor in satisfaction of the Claim. The Claim is based on amounts owed to Assignor by Debtor as set forth below and this Assignment shall be deemed an absolute and unconditional assignment of the Claim for the purpose of collection and shall not be deemed to create a security interest.

Assignor represents and warrants that:

A Proof of Claim in the amount of $2,707.81 has been duly and timely filed in the Proceedings (a true copy of such Proof of Claim is attached to this Assignment). If the Proof of Claim amount differs from the Claim amount set forth above, Assignee shall nevertheless be deemed the owner of that Proof of Claim subject to the terms of this Agreement and shall be entitled to identify itself as owner of such Proof of Claim on the records of the Court.

Assignor further represents and warrants that the amount of the Claim is not less than $2,707.81 that the amount is valid and that no objection to the Claim exists. Assignor further represents and warrants that no payment [has] been received by Assignor, or by any third party claiming through Assignor, in full or partial satisfaction of the Claim, that Assignor has not previously assigned, sold or pledged the Claim to any third party, in whole or in part, that Assignor owns and has title to the Claim free and clear of any and all liens, security interests or encumbrances of any kind or nature whatsoever, and that there are no offsets or defenses that have been or may be asserted on behalf of Debtor or any other party to reduce the amount of the Claim or to impair its value.

Assignor is aware that the above Purchase Price may differ from the amount ultimately distributed in the Proceedings with respect to the Claim and that such amount may not be absolutely determined until entry of a final order confirming a plan of reorganization. Assignor acknowledges that, except as set forth in this Assignment, neither Assignee nor any agent or representative of Assignee has made any representation whatsoever to Assignor regarding the status of the Proceedings, the condition of the Debtor (financial or otherwise) or any other matter relating to the Proceedings, the Debtor or the Claim.

Assignor represents that it has adequate information concerning the business and financial condition of the Debtor and the status of the Proceedings to make an informed decision regarding the sale of the Claim and that it has independently and without reliance on Assignee, and based on such information as Assignor has deemed appropriate (including information available from the files of the Court of the Proceedings), made its own analysis and decision to enter into this Assignment of Claim. Assignor agrees to make to Assignee immediate proportional restitution and repayment of the above Purchase Price to the extent that the Claim is disallowed, reduced, subordinated or impaired for any reason whatsoever, in whole or in part, together with interest at the rate of ten percent (10%) per annum on the amount repaid for the period from the date of this Assignment through the date such repayment is made. Assignor further agrees to reimburse Assignee for all losses, costs and expenses, including reasonable legal fees and costs, incurred by Assignee as a result of such disallowance or Assignor's objection to the transfer of this Claim.

In the event the Claim is ultimately allowed in amount in excess of the amount purchased herein, Assignor is hereby deemed to sell to Assignee, at Assignee's option only, and Assignee hereby agrees to purchase, the balance of said Claim at the same percentage of claim paid herein not to exceed twice the claim amount specified above. Assignee shall remit such payment to Assignor upon Assignee's satisfaction that the Claim has been allowed in the higher amount and is not subject to any objection by the Debtor.

Assignor irrevocably appoints Assignee as its true and lawful attorney and authorizes Assignee to act in Assignor's stead, to demand, sue for, compromise and recover all such amounts as now are, or may hereafter

In late 1999 and early 2000, former employees of the debtor began to send LSI executed assignments. Some former employees also called LSI and spoke to Minkoff and/or Jack Singh, another employee of LSI. Minkoff testified at trial that (1) he identified himself on the telephone as a representative of LSI, which he described as an independent investor interested in purchasing claims; (2) he advised callers that LSI had no relationship with the debtor; and (3) neither he nor Singh made any representations regarding the ultimate distribution to creditors, the priority of wage claims or the probability of success of the WARN Act litigation between the debtor and the Teamsters. He stated that if former employees asked whether they should show LSI's letter to an attorney, he encouraged them to do so. LSI ultimately purchased claims from both former employees and trade creditors of the debtor. Only 85 union members and three non-union members made such assignments of claims to LSI.

Neither the Teamsters nor the individual claimants made a timely objection to the assignments. Minkoff testified that LSI tendered payment of the purchase price set forth in the assignments to the individual defendants, after it performed its due diligence and confirmed the claim amounts with the debtor. The Court was not privy to all of the adjustments that were made during this time, making the amounts impossible to trace. It has therefore been impossible to reconcile the debtor's Schedule E, the employee claims,[4] the claim assignments and the checks tendered from LSI to the employees. Nonetheless, the individual claimants cashed the checks they received from LSI for their claims.

In January 2001, counsel for the Teamsters contacted LSI claiming to represent the former employees who had sold their claims to LSI. Thereafter, the Teamsters advised LSI that the individuals would not perform their obligations under the assignments. By letter dated March 13, 2001, counsel advised LSI that it considered the transfers to be void and that the Teamsters intended to hold LSI liable for all such amounts paid over to LSI.

On June 11, 2001, the debtor filed the first of the three instant complaints for interpleader against LSI, the Teamsters and the employees, pursuant to Federal Rule of Civil Procedure 22 and 28 U.S.C. § 1335, commencing this adversary proceeding.[5]

become, due and payable for or on account of the Claim here assigned. Assignor grants unto Assignee full authority to do all things necessary to enforce the Claim and its rights thereunder pursuant to this Assignment of the Claim. Assignor agrees that the powers granted by this paragraph are discretionary in nature and that Assignee may exercise or decline to exercise such powers at Assignee's sole option. Assignee shall have no obligation to take any action to prove or defend the Claim's validity or amount in the Proceedings. Assignee agrees to take such further action, at its own expense, as may be necessary or desirable to effect the Assignment of the Claim and any payments or distributions on account of the Claim to Assignee, including, without limitation, the execution of appro-

priate transfer powers, corporate resolutions and consents.
Assignment, Teamsters' Exhibit No. 6.

4. Not all of the employees who assigned their claims to LSI filed claims with the bankruptcy estate on their own behalf. Employees were assigned a portion of the settlement distribution regardless of whether they filed a claim with the bankruptcy estate.

5. Federal Rule of Civil Procedure 22(1) provides:

(1) Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is

In November of 2001, while this adversary was pending but before the trial, an advisory entitled "Preston Advisory on Selling Claims to Brokers" was posted on the Teamsters website. The advisory included clauses that read:

> You should be extremely wary of selling your claim in this fashion. Because of the recent settlement in Preston, Teamsters will receive at least $2,000 for the WARN Act plus their vacation pay. The amount offered by the claims broker is therefore much less than a typical employee's likely recovery. For example, if you are offered $700 on a $2,000 claim, the broker will keep the $1300 balance of your claim as profit and you will lose the recent settlement.
>
> \* \* \* \* \* \*
>
> It is your choice whether to sell your individual claim in this fashion. You are however being asked to sell your claim very cheaply and to assume the entire risk that the claim is not allowed by the court.

This evidence was not discovered by LSI until after the trial. At that time, LSI filed a motion to admit newly-discovered evidence which this Court granted.

## CONTENTIONS OF THE PARTIES

The Teamsters included three counts in their cross-claim against LSI: (1) Violation of Ethical and Local Rules; (2) Contract of Adhesion, Misrepresentation, Mistake, Undue Influence and Fraud; and (3) Violation of Labor Law.

As to the first count, the Teamsters claim that Minkoff knew or should have known that the Teamster employee cross-claim plaintiffs were represented by counsel in their Chapter 11 case. They claim that Minkoff's contact with the employees was a violation of Maryland Rule of Professional Conduct 4.2, applicable to the Bankruptcy Court by Local Rule 704 of

---

not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that the plaintiff is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in Rule 20. 28 U.S.C. § 1335 provides:

(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more, or having issued a note, bond, certificate, policy of insurance, or other instrument of value or amount of $500 or more, or providing for the delivery or payment or the loan of money or property of such amount or value, or being under any obligation written or unwritten to the amount of $500 or more, if

(1) Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court with respect to the subject matter of the controversy.

(b) Such an action may be entertained although the titles or claims of the conflicting claimants do not have a common ori-

the United States District Court for the District of Maryland.

With regard to Count II, the Teamsters maintain that LSI created the appearance that the employees were soliciting LSI. The Teamsters continue by arguing that unequal bargaining power exists between LSI and the employees to the detriment of the employees. The Teamsters state that LSI knew or should have known that the employees would receive 100% of their claims. Therefore, by the Teamsters' calculation, LSI was charging the employees 185% interest. Also, the Teamsters contend that Minkoff represented to the employees that he would be their attorney.

The Teamsters' third count against LSI is that LSI violated labor law. The Teamsters contend that TNFINC, Teamster Local Unions and IBT are exclusive representatives of Teamster employee cross-claim plaintiffs for the purposes of enforcing the collective bargaining agreement and the WARN Act. They argue that IBT has sole discretion of the lump sum awarded in settlement and at no time did IBT agree with LSI to sell a portion of the claims.

LSI denies liability on all counts. Rather, LSI asserts that it is the owner of the claims, having paid valuable consideration for their assignment. It maintains each claimant executed an assignment claim in due form, received a negotiated check in payment and that it filed notices of trans-

fer in accordance with Federal Rule of Bankruptcy Procedure 3001(e). It alleges that the notices were served on the individual claimants and the Office of the United States Trustee, none of whom objected to the assignments. LSI argues that there was no violation of labor law, asserting that the law does not prohibit unionized employees from selling their claims in a bankruptcy case and does not prohibit third parties from contacting them.

In its cross-claim [P. 10], LSI listed two counts: (1) Breach of Contract and (2) Tortious Interference with Contract.

Regarding the first count, breach of contract, LSI asserts that the individual cross-claim defendants (the employees) are liable for breach of contract as the Teamsters, purportedly acting on behalf of the individual cross defendants, informed LSI that the individual cross-claim defendants would not perform their obligation under the purchase contracts. LSI maintains that it has already provided the individual cross-claim defendants with good and valuable consideration for these assignments. Regarding the second count, tortious interference with contract, LSI claims that the Teamsters induced the individuals to breach the contracts.

### CONCLUSIONS OF LAW

■ The instant contest between contending creditors over the right to payment of employee wage and WARN Act [6]

---

gin, or are not identical, but are adverse to and independent of one another.

**6.** *See* Sandra J. Mullings, "WARN: Judicial Treatment of Exemptions, Exclusions, and Excuses," 39 Arız. L. Rev. 1209–12, 1256 (1997):

The Worker Adjustment and Retraining Notification Act ("WARN" or the "Act")[29 U.S.C. § 2101, *et. seq.*] became law in 1988. In broad outline, the statute requires that covered employers notify affected employ-

ees and local governmental units sixty days prior to a plant closing or mass layoff, as defined in the Act. If the required notice is not given, the employer is liable to affected employees for back pay and benefits for the period of violation.

As an initial matter in applying WARN, there must be a determination of whether there has been a WARN event, *i.e.*, a "plant closing" or "mass layoff." Those events are defined with reference to whether there has been a threshold number or percentage

claims in a bankruptcy case is a "core proceeding," over which this Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (D), (E), (M) and (O).[7]

■■■ It is well-established that bankruptcy courts have subject matter jurisdiction over claims brought against a debtor-employer under the WARN Act:

> First, it is beyond dispute that this Court has subject matter jurisdiction over claims filed in bankruptcy court which rest on the WARN Act.
>
> > District Courts have original jurisdiction over bankruptcy cases "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts." 28 U.S.C. § 1334(b). [Allowance of claims procedures] are core proceedings. *Id.* § 157(b)(2)(B) and are therefore "squarely within [the bankruptcy court]'s subject matter jurisdiction."
>
> *In re Parker North American Corporation (Parker North American Corporation v. Resolution Trust Corporation),* 24 F.3d 1145, 1149 (9th Cir.1994), *citing Tamposi v. FDIC,* 159 B.R. 631, 634

(Bankr.D.N.H.1993). By filing proofs of claim the Union Group also consented to the court's personal jurisdiction. *In re PNP Holdings Corporation (Tucker Plastics, Inc. v. Pay 'N Pak Stores, Inc.),* 99 F.3d 910 (9th Cir.1996).

*In re Arrow Transp. Co. of Delaware,* 224 B.R. 457, 461 (Bankr.D.Or.1998). It follows and is beyond dispute that bankruptcy courts also have jurisdiction over claims for wages and other employee grievances in a bankruptcy case. Because the bankruptcy court has jurisdiction over WARN Act claims and other employee claims, the bankruptcy court also has jurisdiction over a dispute regarding the proceeds of the claims that are currently within the Court's registry.

## I.

## STANDING

In the case of *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court set forth the following concise explanation of standing:

> ... "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dis-

---

of employment losses at a "single site of employment." These determinations may require fairly complicated calculations and examination of the case law. *Id.*

7. 28 U.S.C. § 157(b)(2)(A), (B), (C), (D), (E), (M) and (O) provides as follows:

> (b)(2) Core proceedings include, but are not limited to—
>
> (A) matters concerning the administration of the estate;
>
> (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate

for purposes of distribution in a case under title 11;

> (C) counterclaims by the estate against persons filing claims against the estate;
>
> (D) orders in respect to obtaining credit;
>
> (E) orders to turn over property of the estate;

\* \* \* \* \* \*

> (M) orders approving the use or lease of property, including the use of cash collateral;

\* \* \* \* \* \*

> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

*Id.*

pute or of particular issues." *Warth v. Seldin,* [ ], 422 U.S. [490, 498], 95 S.Ct. [2197, 2205, 45 L.Ed.2d 343 (1975).] Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked. *See Valley Forge [Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982) ]. The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758, 70 L.Ed.2d 700.

Like the prudential component, the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition. The injury alleged must be, for example, " 'distinct and palpable,' " *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (*quoting Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206, 45 L.Ed.2d 343), and not "abstract" or "conjectural" or "hypothetical," *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The injury must be "fairly" traceable to the challenged action, and relief from the injury must be "likely" to follow from a favorable deci-

sion. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. [26], at 38, 41, 96 S.Ct. [1917], at 1924, 1925[, 48 L.Ed.2d 450 (1976) ]. These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise.

The absence of precise definitions, however, as this Court's extensive body of case law on standing illustrates, *see generally Valley Forge, supra,* 454 U.S. at 471–76, 102 S.Ct. at 757–61, 70 L.Ed.2d 700, hardly leaves courts at sea in applying the law of standing. Like most legal notions, the standing concepts have gained considerable definition from developing case law. In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases. *See, e.g., Los Angeles v. Lyons, supra,* 461 U.S. at 102–05, 103 S.Ct. at 1665–67, 75 L.Ed.2d 675. More important, the law of Art. III standing is built on a single basic idea—the idea of separation of powers. It is this fact which makes possible the gradual clarification of the law through judicial application. Of course, both federal and state courts have long experience in applying and elaborating in numerous contexts the pervasive and fundamental notion of separation of powers.

Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases. Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation be-

tween the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative? These questions and any others relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892), and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process," *Flast v. Cohen*, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). *See Valley Forge*, 454 U.S. at 472–473, 102 S.Ct. at 758–759, 20 L.Ed.2d 947[700].

*Allen v. Wright*, 468 U.S. 737, 750–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556, *quoted in Nat. City Bank of Minneapolis v. Lapides (In re Transcolor)*, 296 B.R. 343, 359–61 (Bankr.D.Md.2003).

■ As suggested by the Supreme Court, the Court has looked to existing case law to aid in its standing analysis. The question of whether a labor union has standing to prosecute and settle WARN Act claims was settled by the Supreme Court in *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). There the Court held that a union had standing to sue under the WARN Act on behalf of its members in the absence of direct injury to itself, as long as the interests it sought to protect were in conformity with the union's purpose. Additionally, the opinion held that the union had standing, even in the absence of the participation of the individual union members as plaintiffs in the lawsuit, as long as the members themselves

had standing. *United Food*, 517 U.S. at 552–57, 116 S.Ct. at 1534–36, 134 L.Ed.2d at 766–71.

■ It is well settled that the unions have standing to prosecute and settle wage and other grievance claims that union members have against an employer. *See Republic Steel v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). In fact, the collective bargaining agreements entered into by the employees make the union their exclusive representative in disputes with the employer. *See* Teamsters Exhibits 1A–1L.

While the procedural posture of the instant case is unique, the standing analysis is the same. It is obvious that the Teamsters had standing to sue in the bankruptcy court to enforce the employees' right to payment in the first instance. It follows that this standing extends to suits in the bankruptcy court against other creditors who contest the employees' right to payment or who attempt to deprive them of that right.

Standing to sue in this context does not depend upon the identity of the defendant, but rather upon the cause of action arising from the defendant's conduct, including the nature of the injury produced by that conduct. The instant interpleader complaint was filed to forestall the Teamsters from bringing a separate suit against the debtor to enforce its members' right to payment of their various claims. Bringing a claim in an interpleader complaint is no different from the claimant filing a separate lawsuit. Because the Teamsters would have had standing to bring such a suit, they also have standing in the instant case.

The instant action does present two peculiarities that require further examination: (1) the union members have already assigned their claims and have done so

without the Teamsters' consent; and (2) the Teamsters have included non-labor law causes of action in its counter-claim. However, the question of the union's standing despite these peculiarities is academic. The union members have been served and have consented to be represented by the Teamsters and its counsel. (*Quare:* In the absence of such consent, would the Teamsters have had standing to object to the assignment of claims by its members? I think not, as indicated by the holding, *infra*, relating to the members' freedom of assignment.) The Teamsters are a valuable resource to its members in its representation of their interests, a representation to which they have consented.

Moreover, outside of the instant legal proceeding, the Teamsters have already accused LSI of fraudulently inducing the employees to assign their claims. On this basis, the debtor filed the instant interpleader suit against the Teamsters, LSI and the employees. Therefore, the Teamsters were brought into the Court involuntarily as an alleged adverse claimant to the funds, and ordered to file a counter-claim to the disputed funds.

## II.

### OWNERSHIP OF THE CLAIMS

■ The Teamsters claim that it not only has standing to sue to recover the claims on behalf of its members, but that they are the actual owner of the claims, to the extent that its members do not enjoy the legal right to assign the claims without the approval of the Teamsters. Standing to sue to recover a claim and the actual ownership of the claim are two different things. The language of the WARN Act itself makes it very clear that the WARN Act claims belong to the individuals:

§ 2104. Administration and enforcement of requirements

(a) Civil actions against employers

(1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to *each aggrieved employee* who suffers an employment loss as a result of such closing or loss as a result of such closing or layoff for . . .

(5) A person seeking to enforce such liability, including a representative of employees or a unit of local government aggrieved under paragraph (1)[ ], may sue either for such person or for other persons similarly situated, or both in any district court of the United States for any district in which the violation is alleged to have occurred, or in which the employer transacts business.

29 U.S.C.A. § 2104 (West 1999) (Emphasis added.).

A fundamental premise of the *United Food* opinion was that the union was not the owner of the WARN Act claims. Had it been, there would be no question of the union's standing to sue the employer on the claims. The following language in the opinion makes it clear that the union in the instant case is not the actual owner of the WARN Act claims:

Since the union is the "representative of employees . . . aggrieved," it is a person who may sue on behalf of the "persons similarly situated" in order to "enforce such liability." "[S]uch liability" must refer to liability under § 2104, since its remedies are exclusive. *See* 29 U.S.C. 2104(b). Because the section makes no provision for liability to the union itself, any "such liability" sought by the union must (so far as concerns us here) be liability to its employee-members, so long as they can be understood to be "persons similarly situated" for the purposes of the Act. We believe they

may be so understood, since each is aggrieved by the employer's failure to give timely notice.

*United Food,* 517 U.S. at 549, 116 S.Ct. at 1532, 134 L.Ed.2d at 765. The fact that the claims belong to the employees is further borne out by the fact that the WARN Act imposes liability for damages against the employer in favor of each aggrieved employee, and not the union of which the aggrieved employee is a member, for back pay for each day that the Act was violated. *Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152 (9th Cir.2001), *cert. denied,* 534 U.S. 973, 122 S.Ct. 395, 151 L.Ed.2d 299 (2001).

It is beyond dispute that employee claims for vacation pay and other grievances, are specific to the individual employees and belong to them.

For all of these reasons, this Court concludes that while the Teamsters have standing to bring suit on behalf of its members for claims under the WARN Act and other employee claims against the debtor, the members are in fact the actual owners of the claims.

## III.

## THE RIGHT TO ASSIGN THE CLAIMS

■ Rule 3001(e) of the Bankruptcy Rules provides the framework and the mechanism for the assignment of claims.[8]

---

8. Rule 3001. Proof of Claim

(e) Transferred claim

(1) Transfer of claim other than for security before proof filed

If a claim has been transferred other than for security before proof of the claim has been filed, the proof of claim may be filed only by the transferee or an indenture trustee.

(2) Transfer of claim other than for security after proof filed

If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 20 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

(3) Transfer of claim for security before proof filed

If a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before

proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount. The proof shall be supported by a statement setting forth the terms of the transfer. If either the transferor or the transferee files a proof of claim, the clerk shall immediately notify the other by mail of the right to join in the filed claim. If both transferor and transferee file proofs of the same claim, the proofs shall be consolidated. If the transferor or transferee does not file an agreement regarding its relative rights respecting voting of the claim, payment of dividends thereon, or participation in the administration of the estate, on motion by a party in interest and after notice and a hearing, the court shall enter such orders respecting these matters as may be appropriate.

(4) Transfer of claim for security after proof filed

If a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security after the proof of claim has been filed, evidence of the terms of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 20 days of the mailing of the notice or within any additional time allowed by the court. If a timely objection is filed by the alleged transferor, the court, after notice and a hearing, shall determine whether the

The rule is designed to permit free assignability with minimal judicial intervention. *See* Fed. R. Bankr.P. 3001, Advisory Committee Note (1991)(stating that the purpose of Rule 3001(e) is to "limit the court's role in the adjudication of disputes regarding transfers of claims."). This purpose is evidenced by the plain language of the rule. The rule contains no restrictions on who may transfer a claim or the nature of such claims that may be transferred by creditors of the estate to third parties. It allows claims to be transferred prior to the claim even being filed and limits the ability to object to a transfer of claim to the transferor. Fed. R. Bankr.P. 3001(e).

■ Likewise, state law favors freedom of assignability. This holds true in both Maryland and New York. (The assignments executed by the individual members contain a clause stating that "This Assignment of Claim shall be governed by and construed in accordance with laws of the State of New York.") *See Medical Mut. Liability Ins. Soc. of Maryland v. Evans*, 330 Md. 1, 29, 622 A.2d 103 (1993); *Tawil v. Finkelstein Bruckman Wohl Most & Rothman*, 223 A.D.2d 52, 55, 646 N.Y.S.2d 691, 692 (1996). Moreover, both Maryland and New York courts have recognized that settlement proceeds may be assigned to a third-party. *See Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 22, 741 A.2d 1143 (1999); *Grossman v. Schlosser*, 19 A.D.2d 893, 893–94, 244 N.Y.S.2d 749, 751 (1963), *In re Holt*, 28 A.D.2d 201, 284 N.Y.S.2d 208 (1967).

The WARN Act is found to contain no provision that forbids the assignment to a third party of claims held by WARN Act creditors against an employer. Likewise, nothing contained in the various master freight agreements between the debtor and the IBT has been found to restrict the rights of the union claimants to assign their claims in the absence of union approval. These agreements merely provide that the TNFINC and the union locals affiliated with the IBT are recognized by the employer as the exclusive collective bargaining representatives of the employees. *See* Teamsters' Exhibits IA through IL.

The Teamsters make much of the fact that it was the exclusive bargaining agent for its members, and as such, no member had the right to dispute the amount of any claim determined by the Teamsters to be his or her share of the Union Settlement Fund. However, the cases cited by the Teamsters do not even deal with claims in a bankruptcy case, but only stand for the proposition that the union is the exclusive representative of its member employees in the prosecution and settlement of claims against an employer that was a party to a collective bargaining agreement.

For instance, citing *Republic Steel*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580, which held that union members subject to

claim has been transferred for security. If the transferor or transferee does not file an agreement regarding its relative rights respecting voting of the claim, payment of dividends thereon, or participation in the administration of the estate, on motion by a party in interest and after notice and a hearing, the court shall enter such orders respecting these matters as may be appropriate.

(5) Service of objection or motion; notice of hearing

A copy of an objection filed pursuant to paragraph (2) or (4) or a motion filed pursuant to paragraph (3) or (4) of this subdivision together with a notice of a hearing shall be mailed or otherwise delivered to the transferor or transferee, whichever is appropriate, at least 30 days prior to the hearing.

F.R.B.P. 3001(e).

a collective bargaining agreement have no right as individuals to prosecute claims against their employer, the Teamsters argued likewise that employees cannot assign their claims without union approval. However, the right of individual members to prosecute their claims is not before the Court. Here, the union prosecuted the WARN Act and other claims on behalf of its members without the members' interference. The Court has determined that the assignments to LSI did not impair the Teamsters' ability to represent the employees as a whole during the WARN Act litigation or diminish the amount recovered by the settlement.

Even were the assignments of claims by the employees a violation of the collective bargaining agreement, LSI would not be liable for such violation. LSI was not a party to the collective bargaining agreement. Furthermore, because the Court has determined that the assignments to LSI had no impact on the Teamsters' representation of the employees as a whole during the WARN Act litigation, there was no demonstrable interference by LSI with the collective bargaining agreement and therefore no damages.

The Teamsters also make much of that fact that their right to determine the amount of each member's claim was written into the Plan. However, this provision does not give the union authority over a member's freedom of action with respect to their individual share of the settlement. The members are within their rights to shop the claim for a more certain possibility of payment while the union works to settle their claims. If they could not freely transfer their claims, union members would be forced to accept the risk of waiting for the Teamsters to recover some part of the claim on their behalf, without assurance of full recovery. This would produce the strange result of permitting all claim-

ants to freely transfer their claims, except union members.

Selling the claims to LSI before the amount of their claim had been finally determined by the IBT is no different than an individual selling a claim before a matter is fully settled. As discussed *supra,* this is permitted by law. *See Attorney Grievance Comm'n,* 357 Md. at 22, 741 A.2d 1143 (1999); *Grossman,* 19 A.D.2d at 893–94, 244 N.Y.S.2d at 751 (1963), *Holt,* 28 A.D.2d 201, 284 N.Y.S.2d 208 (1967). This Court therefore concludes as a matter of law that union members may freely assign their wage and WARN Act claims against the debtor's estate, without the prior or subsequent approval of the union of which they are members.

The Court came to this conclusion without giving any weight to the final piece of evidence entered in this case, namely the posting on the Teamsters' website of a warning to union members regarding risks associated with the assignment of their claims. LSI argues that the posting was an admission on the part of the Teamsters that union members are allowed to freely transfer their wage and WARN Act claims. The Court, however, finds the posting to be ambiguous. It is unclear whether it referred only to wage claims or to WARN Act claims as well. Additionally, the identity of the person who posted the warning is unknown. Because the posting may not definitely be attributable to any official action of the Teamsters, it is found to be of no probative value.

Because the employees' claim assignments are valid, the employees who agreed to assign their claims and then reneged on their agreement are in breach of their obligations under the assignment contracts. Therefore, Count I of LSI's cross-claim, Breach of Contract, will be granted. The Court will award damages

to LSI in the amount of the $220,083.11—the total amount due and owing LSI for the claim assignments and the amount currently in the registry of the Court.

## IV.

## VOIDABILITY OF THE ASSIGNMENTS

The Teamsters argue that the assignments should be deemed invalid or void because (1) LSI violated ethical rules in purchasing the claims and, independently, (2) the assignment contracts between LSI and the employees were contracts of adhesion, misrepresentation, mistake, undue influence and fraud.

### (1) Violation of Ethical Rules

■ The Teamsters argue that LSI violated Rule 4.2 of the Maryland Rules of Professional Conduct by approaching the individuals rather than approaching the lawyers for the IBT. Rule 4.2 of the Maryland Rules of Professional Conduct provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has consent of the other lawyer or is authorized by law to do so.

*Id.* The set of facts currently before the court are not the circumstances that this rule was intended to address. Even were the rule to be applied to the facts at hand, there was no violation of Rule 4.2 because Minkoff was not acting as an attorney when he approached the union members and, independently, even had he been, he had no reason to know that the union members were represented by counsel. Finally, even if there were a violation of Rule 4.2, a civil remedy is not appropriate and will not be awarded.

" 'The rule appears to be intended to "protect a defendant from the danger of being 'tricked' into giving his case away by opposing counsel's artfully crafted question." Logically, these concerns are implicated after the parties are in an adversarial relationship.' " *United States v. Ryans*, 903 F.2d 731, 739 (10th Cir.1990)(internal citations omitted). The relationship between the union members and LSI was not adversarial at the time the union members were approached by Minkoff. Minkoff certainly was not looking to gain an advantage in pending litigation. He was merely pursuing a profit through the transaction of his business, acting not as an attorney, but as a claims trader for LSI. The Court has already determined that the assignment of the claims had no effect upon the settlement of the WARN Act adversary. Therefore, the Court concludes that Minkoff's contact with the employees is beyond the reach of the Rules of Professional Conduct.

There are other reasons for holding that Minkoff did not violate Rule 4.2. First, the language of the rule specifies that the individual engaged in the inappropriate communication must be an "lawyer." Minkoff had no communications with the individual members regarding the WARN Act litigation and, for that matter, had no knowledge of the details of the WARN Act litigation. All communications between him and the individual defendants related solely to the issue of the sale of claims. Therefore, because Minkoff was acting as a claims trader rather than a lawyer, he did not violate Rule 4.2. *See In re Mettler*, 305 Or. 12, 748 P.2d 1010, 1012 (1988)(attorney working for state securities examiner was not subject to anti-contact rule where position did not require him to be a lawyer); *Ryland v. Taylor, Porter, Brooks & Phillips*, 496 So.2d 536, 541–42, *cert. denied*, 497 So.2d 1388 (La.1986)(an attor-

ney performing an act that a business principal might perform may contact an opposing party).

Independently, Rule 4.2 requires that the lawyer whose conduct is being questioned know that the individual he contacts is represented by counsel. Minkoff neither knew or should have known that the union members were represented by counsel. He testified at trial that he had no knowledge that the individual defendants were represented by counsel and that none of the union members ever advised Minkoff that they were represented by counsel. The public record of this case also gave Minkoff no reason to believe that the individual union members were represented by counsel. No attorney has filed an entry of appearance on behalf of the individual employees in the bankruptcy case. While the evidence demonstrates that several individuals who transferred their claims executed powers of attorney to counsel for the IBT to settle and dispose of their claims and to accept distributions on their behalf, Minkoff would have no way to know that this occurred. Interestingly, several of the powers of attorney pointed to by the Teamsters were executed well after the individuals had assigned their claims. For example, William Todd assigned his claim on December 27, 1999 but did not execute a power of attorney to the union until January 19, 2001, more than a year later. It would have been impossible for Minkoff to discover documents that did not even exist at the time of transfer.

Minkoff would also have no reason to connect the individual employees with the IBT. For reasons unknown, the notice of appearance allegedly filed by the IBT on behalf of the employees on August 12, 1999 was never recorded on the docket of the bankruptcy case. While individual attorneys entered their appearances on behalf of the IBT sometime later, after many of the assignments had been made, no one examining the record of this case would have connected the union lawyers to the individuals who had filed claims on their own behalf.

■ Finally, a violation of Rule 4.2 cannot be the basis for imposing civil liability upon Minkoff and therefore cannot be used to void the assignments or to deem them invalid. The Maryland Rules of Professional Conduct "are not designed to be a basis for civil liability" and a "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." Preamble to Rules of Professional Conduct (2001). *See also Hooper v. Gill,* 79 Md. App. 437, 442, 557 A.2d 1349 (1989), *cert. denied,* 317 Md. 510, 564 A.2d 1182, and *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990)(the general rule adopted by "the overwhelming majority of courts" holds that violation of the professional conduct rules "does not give rise to a civil cause of action.")

Therefore, Count I of the Teamsters Cross–Claim, Violation of Ethical Duties and Rules, will be denied.

*(2) Contract of Adhesion, Misrepresentation, Mistake, Undue Influence and Fraud*

■ Historically, bankruptcy courts policed the trading of claims. *See In re Revere Copper and Brass, Inc.,* 58 B.R. 1 (Bankr.S.D.N.Y.1985). However, the effect of the 1991 amendments to Federal Rule of Bankruptcy Procedure 3001(e) was to circumscribe the power of bankruptcy courts to police claims trading.[9] The Rule

---

9. As explained by the Advisory Committee Notes to Fed. R. Bankr.P. 3001(e):

Subdivision (e) is amended to limit the court's role to the adjudication of disputes

does not seek to divest the Court of its power to resolve the instant dispute, over which the Court possesses subject matter jurisdiction. However, Rule 3001(e) narrows the Court's role in determining the validity of the assignment of claims to ruling upon the filing of a timely objection. An objection to a transfer of a claim is timely if filed within 20 days of the mailing of the notice of assignment or within such additional time as may be allowed by the Court. If the transferor files a timely objection and the Court finds, after notice and a hearing, that the claim has been transferred other than for security, the Court shall substitute the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor. It is beyond dispute that no timely objection was made to the assignments at issue.

Therefore, according to the Rule, the assignments are valid and beyond the ability of the Teamsters and its members to contest, or the Court to rescind, regardless of alleged inadequate consideration or unequal bargaining power. *See Official Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1314 (1st Cir.1993):

> Appellees suggest the policy of the Code is that, regardless of the source of the payments, nonpriority creditors should never receive a return on their claims if priority creditors receive nothing. This theory of Code policy is directly contradicted by the fact that nonpriority creditors routinely receive payment from third parties for their claims without interference by the bankruptcy court. Unsecured creditors often sell their claims to third parties, *e.g.*, for 30 cents on the dollar, in order to avoid the uncertainty and delay of bankruptcy proceedings. *See* Chaim J. Fortgang & Thomas Moers Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11, 12*, CARDOZO L. REV. 1, 2–3 (1990). The Code does not speak to the validity of claim transfers, and the Bankruptcy Rules provide only procedures for the filing of notice required for a transferee to be recognized as the holder of the claim. *See* Bankr.Rule 3001(e); *In re Odd Lot Trading, Inc.*, 115 B.R. 97, 100 (Bankr.N.D.Ohio 1990); Fortgang & Mayer, *Trading Claims*, at 19–25. The circumstances in which claims transfers are expressly said to be invalid are limited. For example, the purchasing of claims by an affiliate or insider of the debtor for the sole purpose of blocking the confirmation of competing plans may constitute "bad faith" for the purposes of section 1126(e), 11 U.S.C. § 1126(e). *See In re Applegate Property, Ltd.*, 133 B.R. 827, 834–35 (Bankr.W.D.Tex.1991). An assigned claim may be limited if the as-

---

regarding transfers of claims. If a claim has been transferred prior to the filing of a proof of claim, there is no need to state the consideration for the transfer or to submit other evidence of the transfer. If a claim has been transferred other than for security after a proof of claim has been filed, the transferee is substituted for the transferor in the absence of a timely objection by the alleged transferor. In that event, the clerk should note the transfer without the need for court approval. If a timely objection is filed, the court's role is to determine wheth-

er a transfer has been made that is enforceable under nonbankruptcy law. This rule is not intended either to encourage or discourage postpetition transfers of claims or to affect any remedies otherwise available under nonbankruptcy law to a transferor or transferee such as for misrepresentation in connection with the transfer of a claim. "After notice and a hearing" as used in subdivision (e) shall be construed in accordance with paragraph (5).

*Id.*

signment involves a breach of fiduciary duty or fraud and the breach of duty or fraud enables the assignee to acquire the claim for inadequate consideration. *In re Executive Office Centers, Inc.,* 96 B.R. 642, 649 (Bankr.E.D.La.1988). However, absent some effect on the administration of the estate or diminution of estate property, neither the Code nor the Rules prohibit or discourage creditors from receiving cash from nondebtors in exchange for their claims.

*Stern,* 984 F.2d at 1314.

Even if the Bankruptcy Court were in the business of policing claims trading, the Teamsters have not proven to the satisfaction of this Court that LSI committed actionable fraud and/or made false misrepresentations that induced the employees in this case to part with their claims for grossly inadequate consideration. The assignment contracts were not so biased against the employees as to shock the conscience of the Court.

 Wage claims are entitled to priority under the Bankruptcy Code, 11 U.S.C. § 507, but payment may not be possible if the debtor's estate is insolvent. Depending upon the circumstances of the case and its venue, WARN Act claims may or may not be entitled to priority classification. *See, for example,* the following cases holding in favor of WARN Act priority: *Barnett v. Jamesway Corp. (In re Jamesway Corp.),* 242 B.R. 130 (Bankr.S.D.N.Y.1999); *In re Beverage Enterprises, Inc.,* 225 B.R. 111 (Bankr.E.D.Pa.1998); *In re Riker Indus., Inc.,* 151 B.R. 823 (Bankr.N.D.Ohio 1993); *Contra, Bachman v. Commercial Financial Services, Inc. (In re Commercial Financial Services, Inc.),* 246 F.3d 1291 (10th Cir.2001); *International Brotherhood of Teamsters, AFL–CIO v. Kitty Hawk International, Inc. (In re Kitty Hawk, Inc.),* 255 B.R. 428 (Bankr.N.D.Tex. 2000).

Accordingly, it was conceivable that the employees who assigned their claims to LSI could have bettered their position, depending upon the outcome of the case, which was impossible to predict at the time the assignments were made. Additionally, not only did the employees receive guaranteed payment but they received it up front. This is an important part of the consideration the employees received for their claims. Taken together, these factors lead the Court to conclude that the employees received adequate consideration for the assignment of their claims.

 The Teamsters had various other complaints about the assignments, including that they "nowhere contained a warning that the individual should consult his attorney. On the contrary, the document stated that LSI would *become* the member's attorney." Brief of the Teamsters National Freight Industry Negotiating Committee in Support of Motion for Partial Summary Judgment, P. 23 at 3.

The Court finds this allegation to be without merit. The provision in question merely appoints an "attorney in fact" in order to carry out the terms of the assignment and is standard in virtually every assignment. The provision does not create an attorney-client relationship between LSI and the union members who assigned their claims. Therefore, the provision is reasonable under the circumstances.

 The Teamsters also make much of the following provision of the assignments:

Assignor agrees to make to Assignee immediate proportional restitution and repayment of the above Purchase Price to the extent that the Claim is disallowed, reduced, subordinated or impaired for any reason whatsoever, in whole or in part, together with interest at the rate of ten percent (10%) per annum on the amount repaid for the

period from the date of this Assignment through the date such repayment is made. Assignor further agrees to reimburse Assignee for all losses, costs and expenses, including reasonable legal fees and costs, incurred by Assignee as a result of such disallowance or Assignor's objection to the transfer of this Claim.

Assignment, Teamsters' Exhibit No. 6.

The Court does not agree with the position of the Teamsters that the clause requires the member to reimburse LSI and pay a penalty if the claim were paid in an amount greater than $0.35 on the dollar. Rather, the clause is to be read as a protection for LSI in the event that the assigned claims were false or unfounded. Therefore, this provision of the contracts is reasonable.

Therefore, Count II of the Teamsters cross-claim, Contract of Adhesion, Misrepresentation, Mistake, Undue Influence and Fraud, is hereby denied.

## V.

## TORTIOUS INTERFERENCE WITH CONTRACT

■ Count II of LSI's cross-claim is for tortious interference. LSI asserts that the Union tortiously interfered with its contracts with the individual union members by instructing them not to make good on their contracts with LSI.

Maryland first recognized a cause of action for tortious interference with contract in the case of *Gore v. Condon,* 87 Md. 368, 39 A. 1042 (1898):

The right to maintain the action can also be sustained, upon the doctrine that a man who induces one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong. *Lucke v. Clothing Cutters['],* 77 Md. [396], 398, [26 A. 505]; *Angle v.*

*Chicago, St. Paul & [Minneapolis, Omaha]c. Railway [Co.],* 151 U.S. [1], 14, [14 S.Ct. 240, 38 L.Ed. 55]; *Lumley v. Gye,* 2 El. & Bl. 216; *Bowen v. Hall,* 6 Q.B.D. 333; *Walker v. Cronin,* 107 Mass. 555.

*Natural Design, Inc. v. Rouse Company,* 302 Md. 47, 69, 485 A.2d 663, 674 (1984), *citing Gore,* 87 Md. at 376, 39 A. 1042. Later, in *Goldman v. Harford Road Bldg. Ass'n Et al.,* 150 Md. 677, 133 A. 843 (1926), the Maryland Court of Appeals explained:

A contract, it is true, can only impose its obligations upon those who are parties to it, but a duty rests upon third persons not to interfere, without lawful justification, with the due performance of the obligations of the parties under the contract. *Knickerbocker Ice Co. v. Gardiner Co.,* 107 Md. 556, 564, 69 A. 405, 16 L.R.A. (N.S.) 746 [1908]; *Sumwalt Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 414, 80 A. 48 [1911]; *Cumberland Glass Manufacturing Co. v. De Witt,* 120 Md. 381, 392, 87 A. 927, Ann. Cas.1915A, 702; *Gore v. Condon,* 87 Md. 368, 376, 39 A. 1042, 40 L.R.A. 382, 67 Am. St. Rep. 352.

*Goldman,* 150 Md. 677, 133 A. at 845.

Under Maryland law, tortious interference with contract is virtually identical to the tort described in the Restatement (Second) of Torts:

This is not substantially different from the description set forth in Restatement (Second) of Torts § 766:

One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure

of the third person to perform the contract.

*Orfanos v. Athenian, Inc.,* 66 Md.App. 507, 521, 505 A.2d 131, 138–39 (Md.App.1986), *citing* Restatement (Second) of Torts § 766 (1979).

The evidence demonstrates that claim assignment contracts between LSI and individual employees had been executed, that the Teamsters were aware of these contracts and that the Teamsters instructed the union members not to perform their obligations under the contracts.

As was the case in *Orfanos,* the question before the Court is whether the Teamsters acted " 'without legal justification' or, as stated in the Restatement, *supra,* 'improperly.' " *Orfanos,* 66 Md.App. at 521, 505 A.2d at 138. *Orfanos* relied on the Restatement in completing its analysis:

In this regard, Restatement (Second) of Torts § 767 is instructive. It provides:

In determining whether an actor's conduct is intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.,* 505 A.2d at 139. Comment c to Section 767 of the Restatement is also helpful in completing the analysis. It states, in part:

*Business Ethics and Customs*

Violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may also be significant in evaluating the nature of the actor's conduct as a factor in determining whether his interference with the plaintiff's contractual relations was improper of not.

Restatement (Second) of Torts § 767, cmt. c (1979).

The Teamsters were in a difficult position because by law, by contract and by practice the Teamsters' purpose is the protection of the welfare of its members. The Court finds that the Teamsters acted in good faith when they advised their members not to perform on the contracts for the assignment of claims. The Teamsters' actions were not self serving—they were undertaken for the benefit of the employees. Restatement Second of Torts § 773, Asserting Bona Fide Claim, recognizes the right of a union to provide advice to its members when the advice is given in good faith. *Id.* This Court recognizes the right of a labor union to provide advice to its members when there is reason to believe that they are being harmed by someone seeking to obtain unfair advantage over them. Because of the duty the union has to its members, the Court finds that the Teamsters did not intentionally interfere with the assignment contracts in a tortious manner. Alternatively, the Court finds that the Teamsters were justified in the advice they gave and the actions they took.

Independently, under the circumstances, the Teamsters are akin to an agent of/and or counsel to the individual employees. In the case of *Los Angeles*

*Airways, Inc. v. Davis,* 687 F.2d 321, 326 (9th Cir.1982), the Ninth Circuit stated:

A business advisor may counsel his principal to breach a contract that he reasonably believes to be harmful to his principal's best interests.

\* \* \* \* \* \*

Attorneys are frequently called upon by their clients to provide advice regarding the validity of contracts and the consequences of their breach. An attorney can claim the protection of the privilege to induce breach of contract, subject to its qualifications, when he provides his advice in the course of his representation of a client.

*Id.* The relationship between the Teamsters and the employees is quite similar to that of a business advisor and principal and an attorney and client. The facts demonstrate that the Teamsters were serving in a representative capacity for the union members during the time period leading up to the filing of this action. Therefore, a special privilege to provide advice to the union members extends to the Teamsters.

LSI has already prevailed on Count I of its cross-claim. The damages awarded LSI under this count are adequate. Therefore, Count II of LSI's cross-claim, Tortious Interference, will be denied.

 LSI has also requested prejudgment interest, post-judgment interest and attorneys' fees. The Court has some discretion in the awarding of interest. *See Ver Brycke v. Ver Brycke, III,* 379 Md. 669, 843 A.2d 758 (2004); *Crystal v. West & Callahan,* 328 Md. 318, 614 A.2d 560 (Md.1992). Attorney's fees are not ordinarily recoverable in the absence of statute or enforceable contract providing for the recovery of litigation costs. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 717–18, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475, 479 (1967). There is no need to award post-judgment interest because the fund will be immediately payable to LSI upon demand. The Court will not award pre-judgment interest where the conduct of the Teamsters has been found to be in good faith and under color of law. Likewise, the Court has found no basis upon which to grant LSI an award of counsel fees.

For these reasons, Count I of the counter-claim of LSI will be granted, Count II of the counter-claim of LSI will be denied, and the counter-claim of the Teamsters will be denied in its entirety. The funds deposited by the debtor in the registry of the Court will be disbursed to LSI.

ORDER ACCORDINGLY.